# EXHIBIT "A"

**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION**

| | | |
|---|---|---|
| BROOKLYN SPECIALTY INSURANCE COMPANY RISK RETENTION GROUP, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIVIL ACTION NO. 3:22-CV-00006-CAR |
| BISON ADVISORS, LLC formerly known as ARMIS ADVISERS, LLC | ) ) ) | |
| Defendants. | ) ) ) | |

## <u>DECLARATION OF RICK SHAW</u>

Pursuant to 28 U.S.C. § 1746, I, Rick Shaw, do hereby declare under penalty of perjury that the following is true and correct:

1.     I am over twenty-one years of age, under no disabilities, and fully competent to give this Declaration.

2.     I am the President of Brooklyn Specialty Insurance Company Risk Retention Group, Inc. ("BSIC").  BSIC is an insurance company organized and existing under the laws of the state of Alabama.

3.     BSIC issued Policy No. JP-1-1122018 to Paper Impex USA, Inc. ("Paper Impex") for the policy period November 12, 2018, to May 3, 2019 (the "BSIC Policy").  A copy of the BSIC Policy is attached to this Declaration as **Exhibit "1"**.

4.      Coverage under the BSIC Policy is limited to scheduled vehicles included on a list of scheduled vehicles.  Coverage under the BSIC Policy is also limited to scheduled drivers included on a list of scheduled drivers.

5.      I am aware that a lawsuit was filed against Bunyod Kushnazarov ("Kushnazarov"), Paper Impex, Raptor Auto Shipping Inc. ("Raptor") and RPM Freight Systems, LLC arising from a motor vehicle accident (the "Accident") that occurred on March 22, 2019, involving a tractor trailer that was owned by Paper Impex, leased by Paper Impex to Raptor, and driven by Kushnazarov.  A copy of the Second Amended Complaint filed in the lawsuit is attached to this Declaration as **Exhibit "2"**.

6.      The tractor trailer driven by Kushnazarov included a 2018 Volvo Truck VNL670 (VIN# 4V4NC9EH0JN996554) and a 2018 Cottrell trailer (VIN# 5E0AU1740JG026601).

7.      The BSIC Policy contains a list of scheduled vehicles and a list of scheduled drivers.  Neither the truck nor the trailer is listed on the list of scheduled vehicles.  Kushnazarov is not listed on the list of scheduled drivers.

8.      Paper Impex was not insured under the BSIC Policy for any claims asserted against it in connection with the Accident because, among other things, the BSIC Policy did not insure the vehicle involved in the Accident and Kushnazarov was not a scheduled driver.

9.      BSIC did not provide Paper Impex a defense or indemnity in connection with the lawsuit.  BSIC was not a party to the settlement negotiations that resulted in the settlement of the lawsuit, and it did not consent to the release of Paper Impex in the settlement agreement.

Executed this 4th day of October, 2022.

*Rick Shaw*
_____
Rick Shaw

2

# EXHIBIT "1"

# Brooklyn Specialty Insurance Co.
# Risk Retention Group, Inc.
*5630 University Parkway*
*Winston-Salem, NC 27105*

*Tele: (877) 870-9923*

*Email: info@brooklynspecialty.com*

RE: Policy Number  JP-1-112018

Paper Impex USA Inc

3364 Fairdale Rd. 1 Fl

Philadelphia, PA 19154

Welcome to Brooklyn Specialty Insurance Co. RRG, Inc.  Your policy and description of coverage is attached.  Please read it carefully and keep it in a safe place.

I would like to thank you for purchasing your policy from Brooklyn Specialty Insurance Co. RRG, Inc. and look forward to serving your insurance needs.

In the unlikely event that you have the need to contact our claims department, they can be reached at (563) 585-8847 or email rfine@CBCSclaims.com.  Please have your policy number available when you contact them.

If you have specific questions about your policy or the coverages you purchased, please contact your agent directly.

Sincerely,

*Rick Shaw*

Rick Shaw
President
Brooklyn Specialty Insurance Company RRG, Inc.

_____

# FORMS SCHEDULE

**PENNSYLVANIA**

1. Brooklyn Specialty Insurance Co. Welcome Letter
2. Forms Schedule
3. Declaration pages
4. MCS-90 Form
5. Subscription Share Purchase Agreement
6. Scheduled Driver Endorsement
7. Claim Reporting Instructions
8. **IL00171198** Common Policy Conditions
9. **CA00201013** Motor Carrier Coverage Form
10. **ILN1290206** Pennsylvania Auto fraud statement
11. **CA01800616** Pennsylvania Changes
12. **IL01201013** Pennsylvania changes – Defense costs
13. **IL09100702** Pennsylvania Notice
14. **IL02460907** Pennsylvania changes – cancellation and nonrenewal
15. **IL22010908** Nuclear Energy Liability Exclusion Endorsement
16. **CA23011013** Explosives
17. **CA23051013** Wrong Delivery of liquid Products
18. **CA23840106** Exclusion of Terrorism
19. **CA23860106** Exclusion of terrorism above minimum statutory limits
20. **CA23940306** Silica or silica-related dust exclusion for covered autos exposure

**Brooklyn Specialty Insurance Co. RRG, Inc**
**5630 University Parkway Winston-Salem, NC 27105**
**NAIC # 16396**

<span style="color:red">**IMPORTANT NOTICE**</span>
**To All Insured Members**

## Claims

All claims regardless of fault **MUST BE REPORTED** to us **IMMEDIATELY**.  Claims
**NOT** reported immediately may result in your coverage being **CANCELED**.

## Drivers

All new drivers hired during the policy term MUST BE REPORTED to us
immediately.  **Accidents with UNREPORTED** drivers will be viewed as an increase
in **HAZARD/EXPOSURE** and may result in **CANCELLATION** or **NONRENEWAL** of
your coverage.

## Vehicles

If we filed a **REGULATORY FILING** on your behalf, all units you own, operate
and/or lease **MUST BE SCHEDULED** on your policy.  Vehicles **NOT SCHEDULED**
will result in immediate **CANCELLATION** of your policy**.**

**Brooklyn Specialty Insurance Co. RRG, Inc**
**5630 University Parkway Winston-Salem, NC 27105**
**NAIC # 16396**

## CERTIFICATE OF AUTOMOBILE LIABILITY INSURANCE

**Master Policy Number:**  JP-1-112018

**Certificate Number:**  JP-1-112018

**(X)** Annual Premium Basis          () Monthly Premium Basis

**ITEM ONE**
Member Insured Name and Address:
 Paper Impex USA, Inc
 3364 Fairdale Rd 1 FL
 Philadelphia PA 19154

### Managing Underwriter

Clayton Specialty LLC
9805 E Bell Rd Ste 110
Scottsdale AZ 85260

This Certificate of Automobile Liability Insurance attaches to and forms a part of the Master Policy Number described above.  This Certificate of Automobile Liability Insurance shall take effect for the period described below, and shall be subject to the terms and conditions stated in the governing Master Policy attached herewith:

Policy Period:

Effective:   11/12/2018        At 12:01 A.M. Standard Time at your mailing address.

Expires:    11/12/2019

**This policy is issued by a Risk Retention Group. This Risk Retention Group may not be subject to all of the insurance laws and regulations in your State.  This Risk Retention Group is not covered by, nor are you protected under, any State insurance insolvency guaranty fund.**

# Brooklyn Specialty Insurance Co. RRG, Inc

**5630 University Parkway Winston-Salem, NC 27105**
**NAIC # 16396**

**Note:** Officers' facsimile signatures may be inserted here at the company's option.
**Countersignature of Authorized Representative:**

*Rick Shaw*

**Rick Shaw, President**
**Dated: 11/12/2018**

## ITEM TWO

## Schedule of Coverages

This Certificate of Automobile Liability Insurance provides only those coverages where a charge is shown in the premium column below. Each of these coverages will apply only to those "autos" shown as covered "autos" and which appear on the Schedule of Covered Autos shown herein. **"Autos" are shown as covered "autos" for a particular coverage by the entry of one or more of the symbols from the Covered Autos Section of the Motor Carriers Coverage Form next to the name of the coverage.**

**Motor Carriers Coverage Form; Coverage is provided where a premium is shown.**

| Coverage | Symbol | Limit | Monthly Premium | Annual Premium |
|---|---|---|---|---|
| Automobile Liability | 67 | $1,000,000 | | $ ██████████ |
| Personal Injury Protection | | Stated in Each Personal Injury Protection Endorsement Minus $ Deductible | | |
| Added Personal Injury Protection | | Stated in Each Added Personal Injury Protection Endorsement Minus $ Deductible | | |
| Medical Expense & Income | | | | |
| Loss Benefits (VA Only) | | | | |
| Uninsured Motorists | 67 | $ ███████ | | INCLUDED |
| Underinsured Motorists | | NONE | | |
| Hired (or Borrowed) Auto | | | | |
| Non-Ownership Liability | | | | |

| | |
|---|---|
| Policy Premium: | $ ██████████ |
| Capital Contribution: | |
| Association Fee: | $ ██████████ |
| Tax: | $ ██████████ |
| Total: | $ ██████████ |

**Note:    Advance premium is refunded at policy termination less any amounts due to insurer.**

**Symbol Definitions:**
**Symbol 61** – Any Auto, **Symbol 62** – Owned Autos Only, **Symbol 63** – Owned Private Passenger Vehicles, **Symbol 64** – Owned Commercial Autos Only, **Symbol 65** – Owned Autos Subject to No-Fault Laws, **Symbol 66** – Owned Autos Subject to Compulsory Uninsured Motorist Laws, **Symbol 67** – Specified Described Autos, **Symbol 68** – Hired Auto Only, **Symbol 69** – Trailers in Your Possession Under a Trailer Interchange Agreement, **Symbol 70** – Your Trailers in the Possession of Another Trucker Under a Trailer Interchange Agreement, **Symbol 71** – Non-Owned Autos Only.

## ITEM THREE

## Schedule of Covered Autos

**Brooklyn Specialty Insurance Co. RRG, Inc**
**5630 University Parkway Winston-Salem, NC 27105**
**NAIC # 16396**

As per the attached vehicle schedule

## ITEM FOUR

### Hired or Borrowed Covered Auto Coverage and Premiums

Cost of Hire means: The total dollar amount of costs you incurred for the hire of automobiles (includes trailers and semitrailers), and if not included therein.  The total remunerations of all operators and drivers helpers, of hired automobiles whether hired with a driver by lessor or an "employee" of the lessee, or any other third party, and the total dollar amount of any other costs (i.e., repair, maintenance, fuel, etc.) directly associated with operating the hired automobiles whether such costs are absorbed by the insured, paid to the lessor or owner, or paid to others.

| Estimated Cost of Hire | Rate Per Each $100 Cost of Hire | Total Estimated Premium |
|---|---|---|
| | | |

## ITEM FIVE

### Schedule for Non-Ownership Liability

| Rating Basis | Number | Premium |
|---|---|---|
| Number Of Employees: | | |

**The following regulatory filings have been issued on your behalf:**

[ X ]    **Federal Motor Carrier Safety Administration**

[ ]    **Specific State Regulatory Filings for the following states**

[ X ]    **USDOT MCS-90**

NOTE: Per the terms of these filings made on your behalf you agree to reimburse Brooklyn Specialty Insurance Co. RRG  (BSICRRG) for any payment made by BSICRRG on account of any accident, claim, or suit involving a breach of the terms of this policy, and for any payment that BSICRRG would not have been obligated to make under the provisions of the policy except for the agreements contained in these filings.

**Brooklyn Specialty Insurance Co. RRG, Inc**
**5630 University Parkway Winston-Salem, NC 27105**
**NAIC # 16396**

The following additional insured or **Additional Interest** endorsements have been issued on your behalf:

| No. | Company Name | Street Address | Zip | City | | State | Waiver of Subrogation |
|-----|--------------|----------------|-----|------|---|-------|----------------------|
| **Additional Interests** | | | | | | | |
| | Interest Type | Vehicle | | | | Added | Removed |
| | | | | | | | |

| | Year | Make | Model | VIN |
|---|---|---|---|---|
| 1 | 2017 | Volvo | VNL, 12.8L | 4V4NC9EH2HN982343 |
| 2 | 2018 | Volvo | VNL, 12.8L | 4V4NC9EH9JN996214 |
| 3 | 2018 | Volvo | VNL, 12.8L | 4V4NC9EH0JN996215 |
| 4 | 2018 | Volvo | VNL, 12.8L | 4V4NC9EH5JN886406 |
| 5 | 2018 | Volvo | VNL, 12.8L | 4V4NC9EH3JN886405 |
| 6 | 2018 | Volvo | VNL, 12.8L | 4V4NC9EH7JN886407 |
| 7 | 2016 | Volvo | VNL, 12.8L | 4V4NC9EH3GN939449 |
| 8 | 2015 | Volvo | VNL, 12.8L | 4V4NC9EJ6FN922971 |
| 9 | 2016 | Volvo | VNL, 12.8L | 4V4NC9EH8GN942668 |
| 10 | 2017 | Volvo | VNL, 12.8L | 4V4NC9EH1HN970863 |
| 11 | 2013 | Volvo | VNL, 12.8L | 4V4NC9EH2DN144825 |
| 12 | 2018 | Volvo | VNL, 12.8L | 4V4NC9EH6JN886754 |
| 13 | 2019 | Volvo | 12.8L | 4V4NC9EH5KN900628 |
| 14 | 2019 | Volvo | 12.8L | 4V4NC9EH7KN900629 |
| 15 | 2019 | Volvo | VNL64T 740 | 4V4NC9EH0KN900634 |
| 16 | 2019 | Volvo | VNL, 12.8L | 4V4NC9EJ0KN902998 |
| 17 | 2019 | Volvo | VNL, 12.8L | 4V4NC9EH3KN888382 |
| 18 | 2013 | Volvo | VNL, 12.8L | 4V4NC9EH9DN144837 |
| 19 | 2016 | Volvo | VNL, 12.8L | 4V4NC9EJXGN946207 |
| 20 | 2013 | Volvo | VNL, 12.8L | 4V4NC9EH3DN144820 |
| 21 | 2014 | Volvo | VNL, 12.8L | 4V4NC9EH2EN169791 |
| 22 | 2013 | Volvo | VNL, 12.8L | 4V4NC9EH9DN144823 |
| 23 | 2014 | Volvo | VNL, 12.8L | 4V4NC9EH4EN169792 |
| 24 | 2014 | Volvo | VNL, 12.8L | 4V4NC9EH6EN169826 |
| 25 | 2013 | Volvo | VNL, 12.8L | 4V4NC9EH9DN144840 |
| 26 | 2019 | Volvo | VNL, 12.8L | 4V4NC9EJ9KN901588 |
| 27 | 2019 | Volvo | VNL, 12.8L | 4V4NC9EJ7KN901590 |

**USDOT Number:** 2816195 _____   Date Received: _____

A Federal Agency may not conduct or sponsor, and a person is not required to respond to, nor shall a person be subject to a penalty for failure to comply with a collection of information subject to the requirements of the Paperwork Reduction Act unless that collection of information displays a current valid OMB Control Number. The OMB Control Number for this information collection is 2126-0008. Public reporting for this collection of information is estimated to be approximately 2 minutes per response, including the time for reviewing instructions, gathering the data needed, and completing and reviewing the collection of information. All responses to this collection of information are mandatory. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to: Information Collection Clearance Officer, Federal Motor Carrier Safety Administration, MC-RRA, Washington, D.C. 20590.


United States Department of Transportation
**Federal Motor Carrier Safety Administration**

### Endorsement for Motor Carrier Policies of Insurance for Public Liability
### under Sections 29 and 30 of the Motor Carrier Act of 1980

# FORM MCS-90

**Issued to** Paper Impex USA, Inc. _____ **of** Pennsylvania _____
            *(Motor Carrier name)*                                    *(Motor Carrier state or province)*

**Dated at** 12:00 midnight **on this** 12th **day of** November , 2018

**Amending Policy Number:** JP-1-112018 _____   **Effective Date:** 11/12/2018 _____

**Name of Insurance Company:** Brooklyn Specialty Insurance Company RRG, Inc. _____

**Countersigned by:** Rick Shaw _____          Digitally signed by Rick Shaw
                      *(authorized company representative)*   Date: 2018.11.07 12:17:27 -07'00'

The policy to which this endorsement is attached provides primary or excess insurance, as indicated for the limits shown *(check only one)*:

- ● *This insurance is primary and the company shall not be liable for amounts in excess of $* 1,000,000.00 _____ *for each accident.*
- ○ *This insurance is excess and the company shall not be liable for amounts in excess of $* _____ *for each accident in excess of the underlying limit of $* _____ *for each accident.*

Whenever required by the Federal Motor Carrier Safety Administration (FMCSA), the company agrees to furnish the FMCSA a duplicate of said policy and all its endorsements. The company also agrees, upon telephone request by an authorized representative of the FMCSA , to verify that the policy is in force as of a particular date. The telephone number to call is: (877) 870-9923 _____.

Cancellation of this endorsement may be effected by the company or the insured by giving (1) thirty-five (35) days notice in writing to the other party (said 35 days notice to commence from the date the notice is mailed, proof of mailing shall be sufficient proof of notice), and (2) if the insured is subject to the FMCSA's registration requirements under 49 U.S.C. 13901, by providing thirty (30) days notice to the FMCSA (said 30 days notice to commence from the date the notice is received by the FMCSA at its office in Washington, DC).

*(continued on next page)*

## DEFINITIONS AS USED IN THIS ENDORSEMENT

***Accident*** includes continuous or repeated exposure to conditions or which results in bodily injury, property damage, or environmental damage which the insured neither expected nor intended.

***Motor Vehicle*** means a land vehicle, machine, truck, tractor, trailer, or semitrailer propelled or drawn by mechanical power and used on a highway for transporting property, or any combination thereof.

***Bodily Injury*** means injury to the body, sickness, or disease to any person, including death resulting from any of these.

***Property Damage*** means damage to or loss of use of tangible property.

***Environmental Restoration*** means restitution for the loss, damage, or destruction of natural resources arising out of the accidental discharge, dispersal, release or escape into or upon the land, atmosphere, watercourse, or body of water, of any commodity transported by a motor carrier. This shall include the cost of removal and the cost of necessary measures taken to minimize or mitigate damage to human health, the natural environment, fish, shellfish, and wildlife.

***Public Liability*** means liability for bodily injury, property damage, and environmental restoration.

The insurance policy to which this endorsement is attached provides automobile liability insurance and is amended to assure compliance by the insured, within the limits stated herein, as a motor carrier of property, with Sections 29 and 30 of the Motor Carrier Act of 1980 and the rules and regulations of the Federal Motor Carrier Safety Administration (FMCSA).

In consideration of the premium stated in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere. Such insurance as is afforded, for public liability, does not apply to injury to or death of the insured's employees while engaged in the course of their employment, or property transported by the insured, designated as cargo. It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the company from liability or from the payment of any final judgment, within the limits of liability herein described, irrespective of the financial condition, insolvency or bankruptcy of the insured. However, all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect as binding between the insured and the company. The insured agrees to reimburse the company for any payment made by the company on account of any accident, claim, or suit involving a breach of the terms of the policy, and for any payment that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement.

It is further understood and agreed that, upon failure of the company to pay any final judgment recovered against the insured as provided herein, the judgment creditor may maintain an action in any court of competent jurisdiction against the company to compel such payment.

The limits of the company's liability for the amounts prescribed in this endorsement apply separately to each accident and any payment under the policy because of anyone accident shall not operate to reduce the liability of the company for the payment of final judgments resulting from any other accident.

*(continued on next page)*

## SCHEDULE OF LIMITS — PUBLIC LIABILITY

| Type of carriage | Commodity transported | January 1, 1985 |
|---|---|---|
| **(1)** For-hire (in interstate or foreign commerce, with a gross vehicle weight rating of 10,000 or more pounds). | Property (nonhazardous) | $750,000 |
| **(2)** For-hire and Private (in interstate, foreign, or intrastate commerce, with a gross vehicle weight rating of 10,000 or more pounds). | Hazardous substances, as defined in 49 CFR 171.8, transported in cargo tanks, portable tanks, or hopper-type vehicles with capacities in excess of 3,500 water gallons; or in bulk Division 1.1, 1.2, and 1.3 materials, Division 2.3, Hazard Zone A, or Division 6.1, Packing Group I, Hazard Zone A material; in bulk Division 2.1 or 2.2; or highway route controlled quantities of a Class 7 material, as defined in 49 CFR 173.403. | $5,000,000 |
| **(3)** For-hire and Private (in interstate or foreign commerce, in any quantity; or in intrastate commerce, in bulk only; with a gross vehicle weight rating of 10,000 or more pounds). | Oil listed in 49 CFR 172.101; hazardous waste, hazardous materials, and hazardous substances defined in 49 CFR 171.8 and listed in 49 CFR 172.101, but not mentioned in (2) above or (4) below. | $1,000,000 |
| **(4)** For-hire and Private (In interstate or foreign commerce, with a gross vehicle weight rating of less than 10,000 pounds). | Any quantity of Division 1.1, 1.2, or 1.3 material; any quantity of a Division 2.3, Hazard Zone A, or Division 6.1, Packing Group I, Hazard Zone A material; or highway route controlled quantities of a Class 7 material as defined in 49 CFR 173.403. | $5,000,000 |

*The schedule of limits shown does not provide coverage. The limits shown in the schedule are for information purposes only.

Brooklyn Specialty Insurance Company                                          NAIC No.: **16396**
Risk Retention Group, Inc.                                                    FEIN: **83-1444543**

## SUBSCRIPTION AGREEMENT

In accordance with the laws of the State of North Carolina and the Product Liability Risk
Retention Act of 1981, 15 U.S.C. Section 3901 et seq., as amended ("PLRR Act"),
Brooklyn Specialty Insurance Company Risk Retention Group ("BSIC-RRG" or
"Company") intends to insure the Commercial Auto Liability ("CAL") and other
ancillary liability risks of its members, which will be comprised of commercial
transportation industry owner operators and small to medium sized fleets.

All BSIC-RRG prospective members will be required to sign a Stock Subscription and
Shareholder Agreement as part of their Commercial Auto Liability Insurance
Application. This is included on Page 8 of this application.

**Brooklyn Specialty Insurance Co.**

**Risk Retention Group, Inc.**

**Auto Liability Application**

| SHARE PURCHASE AGREEMENT |
|---|

As an insured with Brooklyn Specialty Insurance Co., RRG you have the opportunity to be a shareholder as well as an insured member. Due to the formation of Brooklyn Specialty Insurance Co. as a Risk Retention Group you will be required to purchase a share of the company which will allow you to be a voting shareholder in the company. No share may be sold, pledged, assigned, exchanged, encumbered, transferred, gifted, conveyed or otherwise disposed of by the Corporation or any Subscriber except as provided in the Corporation's Articles and Bylaws. Upon termination of insurance coverage shares held by the subscriber shall revert back to the Corporation without compensation.

We will offer the following share purchase method.  Please select the below option.

⊠**Share(s) equal; 1 share for each vehicle insured**

The statements and answers given on this application are true and accurate.  The applicant has not willfully concealed or misrepresented any material fact or circumstance concerning this application.

Applicants Name: Zafar Israilov                                    Title: President

Applicants Signature ⊠ *I understand that checking this box constitutes a legal signature.*

Date: 10/25/2018

Producer Signature ⊠ *I understand that checking this box constitutes a legal signature.*

Date: 10/25/2018

## NOTICE

This policy is issued by your risk retention group.  Your risk retention group may not be subject to all of the insurance laws and regulations of your state.  State insurance insolvency guaranty funds are not available for your risk retention group.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# Brooklyn Specialty Insurance Company
## Risk Retention Group, Inc.

## SCHEDULED DRIVER ENDORSEMENT

This endorsement modifies insurance provided under the following:

      MOTOR CARRIER COVERAGE FORM

The provisions of the Motor Carrier Coverage Form apply unless modified by this endorsement.

This endorsement changes the policy effective on the inception date of the policy unless another date is indicated below.

**NAMED INSURED:** Paper Impex USA Inc

**Policy Number:** JP-1-112018

**Endorsement Effective Date:** 11/12/2018

**Policy Period:**    11/12/2018  to 11/12/2019

As a condition of this policy, we will not cover any loss in excess of state minimum financial responsibility requirements involving any vehicle insured on the policy, or any other vehicle to which the terms of the policy are extended, or any non-owned vehicle that is operated or in control of anyone who is not named on the Driver Schedule shown on this endorsement.

This endorsement applies to any loss in excess of the state minimum financial responsibility requirements that are in effect at the time the loss occurs. This endorsement will apply to all coverages.

| DRIVER SCHEDULE | | | | | |
|---|---|---|---|---|---|
| **Name** | **D.O.B** | **State** | **License #** | **Effective Date** | **Termination Date** |
| See Schedule Attached | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

# COMMERCIAL AUTO DRIVER INFORMATION SCHEDULE

| DRIVER # | NAME<br>CITY, STATE AND ZIP CODE | SEX | * MAR<br>STAT | DATE OF BIRTH | YRS<br>EXP | YEAR<br>LIC | DRIVERS LICENSE NUMBER / SOCIAL<br>SECURITY NUMBER | STATE<br>LIC |
|---|---|---|---|---|---|---|---|---|
| 1 | Akmal Suyunov | M | | ███████ | 4 | 2014 | ███████ | PA |
| 2 | Jamol Esanov | M | | ███████ | 4 | 2014 | ███████ | PA |
| 3 | Mexriddin Aliev | M | | ███████ | 4 | 2014 | ███████ | NY |
| 4 | Farrukhjon Annageldiev | M | | ███████ | 4 | 2014 | ███████ | NY |
| 5 | Ruslan Akmataliev | M | | ███████ | 4 | 2014 | ███████ | PA |
| 6 | Nurilla Nazarov | M | | ███████ | 3 | 2015 | ███████ | PA |
| 7 | Khasan Pardaev | M | | ███████ | 4 | 2014 | ███████ | PA |
| 8 | Lutfullo Navruzov | M | | ███████ | 3 | 2015 | ███████ | PA |
| 9 | Uchkunbek Karshiev | M | | ███████ | 4 | 2014 | ███████ | PA |
| 10 | Khojiakbar Nigmatov | M | | ███████ | 4 | 2014 | ███████ | PA |
| 11 | Rinat Khamitov | M | | ███████ | 3 | 2015 | ███████ | PA |
| 12 | Fayzullo Fayzulloev | M | | ███████ | 3 | 2015 | ███████ | PA |
| 13 | Abdurafik Yodgorov | M | | ███████ | 8 | 2010 | ███████ | NY |
| 14 | Jamoliddin Kushbokov | M | | ███████ | 2 | 2016 | ███████ | NY |
| 15 | Abdumalik Aliev | M | | ███████ | 3 | 2015 | ███████ | NY |
| 16 | Komiljon Aktamov | M | | ███████ | 2 | 2016 | ███████ | NY |
| 17 | Muzaffar Mirzaraimov | M | | ███████ | 3 | 2015 | ███████ | NY |
| 18 | Alidjonov Jamshidbek | M | | ███████ | 2 | 2016 | ███████ | PA |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

# *Brooklyn Specialty Insurance Company Risk Retention Group, Inc.*

## Policyholder Notice - Claim Reporting Instructions

We are pleased that you have chosen Brooklyn Specialty Insurance Company RRG, Inc. as your insurance carrier.

We look forward to being of service to you should the need ever arise. CBCS handles claims which arise under policies written within the Brooklyn Specialty Insurance Co. RRG, Inc. for the program in which your coverage was placed. Notice of any claim, suit or incident should be reported as soon as possible.

In the event of a loss or claim involving damage under this policy, please provide immediate notification to:

**CBCS (Claim Administrator for this policy)**

Phone Number Claim Reporting:     (563) 585-8847
E-Mail Claim Reporting:        rfine@CBCSclaims.com

**Mailing Address:**
CBCS
800 Main St.
Dubuque, IA 52001

1 of 1

IL 00 17 11 98

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. Examination Of Your Books And Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. Inspections And Surveys

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. Premiums

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. Transfer Of Your Rights And Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

  Copyright, Insurance Services Office, Inc.,  1998   □

COMMERCIAL AUTO
CA 00 20 10 13

# MOTOR CARRIER COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **VI** – Definitions.

## SECTION I – COVERED AUTOS

Item Two of the Declarations shows the "autos" that are covered "autos" for each of your coverages. The following numerical symbols describe the "autos" that may be covered "autos". The symbols entered next to a coverage on the Declarations designate the only "autos" that are covered "autos".

**A. Description Of Covered Auto Designation Symbols**

| Symbol | Description Of Covered Auto Designation Symbols | |
|---|---|---|
| **61** | Any "Auto" | |
| **62** | Owned "Autos" Only | Only the "autos" you own (and for Covered Autos Liability Coverage any "trailers" you don't own while connected to a power unit you own). This includes those "autos" you acquire ownership of after the policy begins. |
| **63** | Owned Private Passenger Type "Autos" Only | Only the "private passenger type" "autos" you own. This includes those "private passenger type" "autos" that you acquire ownership of after the policy begins. |
| **64** | Owned Commercial "Autos" Only | Only those trucks, tractors and "trailers" you own (and for Covered Autos Liability Coverage any "trailers" you don't own while connected to a power unit you own). This includes those trucks, tractors and "trailers" you acquire ownership of after the policy begins. |
| **65** | Owned "Autos" Subject To No-fault | Only those "autos" you own that are required to have no-fault benefits in the state where they are licensed or principally garaged. This includes those "autos" you acquire ownership of after the policy begins provided they are subject to the no-fault law in the state where they are licensed or principally garaged. |
| **66** | Owned "Autos" Subject To A Compulsory Uninsured Motorists Law | Only those "autos" you own that, because of the law in the state where they are licensed or principally garaged, are required to have and cannot reject Uninsured Motorists Coverage. This includes those "autos" you acquire ownership of after the policy begins provided they are subject to the same state uninsured motorists requirement. |
| **67** | Specifically Described "Autos" | Only those "autos" described in Item Three of the Declarations for which a premium charge is shown (and for Covered Autos Liability Coverage any "trailers" you don't own while attached to any power unit described in Item Three). |
| **68** | Hired "Autos" Only | Only those "autos" you lease, hire, rent or borrow. This does not include any "private passenger type" "auto" you lease, hire, rent or borrow from any member of your household, any of your "employees", partners (if you are a partnership), members (if you are a limited liability company), or agents or members of their households. |
| **69** | "Trailers" In Your Possession Under A Written Trailer Or Equipment Interchange Agreement | Only those "trailers" you do not own while in your possession under a written "trailer" or equipment interchange agreement in which you assume liability for "loss" to the "trailers" while in your possession. |

© Insurance Services Office, Inc., 2011

| Symbol | | Description Of Covered Auto Designation Symbols |
|---|---|---|
| **70** | Your "Trailers" In The Possession Of Anyone Else Under A Written Trailer Interchange Agreement | Only those "trailers" you own or hire while in the possession of anyone else under a written "trailer" interchange agreement. When Symbol **70** is entered next to a Physical Damage Coverage in Item Two of the Declarations, the Physical Damage Coverage exclusion relating to "loss" to a "trailer" in the possession of anyone else does not apply to that coverage. |
| **71** | Non-owned "Autos" Only | Only those "autos" you do not own, lease, hire, rent or borrow that are used in connection with your business. This includes "private passenger type" "autos" owned by your "employees" or partners (if you are a partnership), members (if you are a limited liability company), or members of their households but only while used in your business or your personal affairs. |
| **79** | "Mobile Equipment" Subject To Compulsory Or Financial Responsibility Or Other Motor Vehicle Insurance Law Only | Only those "autos" that are land vehicles and that would qualify under the definition of "mobile equipment" under this policy if they were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where they are licensed or principally garaged. |

**B. Owned Autos You Acquire After The Policy Begins**

1. If Symbols **61, 62, 63, 64, 65, 66** or **79** are entered next to a coverage in Item Two of the Declarations, then you have coverage for "autos" that you acquire of the type described for the remainder of the policy period.

2. But, if Symbol **67** is entered next to a coverage in Item Two of the Declarations, an "auto" you acquire will be a covered "auto" for that coverage only if:

    a. We already cover all "autos" that you own for that coverage or it replaces an "auto" you previously owned that had that coverage; and

    b. You tell us within 30 days after you acquire it that you want us to cover it for that coverage.

**C. Certain Trailers, Mobile Equipment And Temporary Substitute Autos**

If Covered Autos Liability Coverage is provided by this Coverage Form, the following types of vehicles are also covered "autos" for Covered Autos Liability Coverage:

1. "Trailers" with a load capacity of 2,000 pounds or less designed primarily for travel on public roads.

2. "Mobile equipment" while being carried or towed by a covered "auto".

3. Any "auto" you do not own while used with the permission of its owner as a temporary substitute for a covered "auto" you own that is out of service because of its:

    a. Breakdown;

    b. Repair;

    c. Servicing;

    d. "Loss"; or

    e. Destruction.

**SECTION II – COVERED AUTOS LIABILITY COVERAGE**

**A. Coverage**

We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto".

We will also pay all sums an "insured" legally must pay as a "covered pollution cost or expense" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of covered "autos". However, we will only pay for the "covered pollution cost or expense" if there is either "bodily injury" or "property damage" to which this insurance applies that is caused by the same "accident".

© Insurance Services Office, Inc., 2011

We will have the right and duty to defend any "insured" against a "suit" asking for such damages or a "covered pollution cost or expense". However, we have no duty to defend any "insured" against a "suit" seeking damages for "bodily injury" or "property damage" or a "covered pollution cost or expense" to which this insurance does not apply. We may investigate and settle any claim or "suit" as we consider appropriate. Our duty to defend or settle ends when the Covered Autos Liability Coverage Limit of Insurance has been exhausted by payment of judgments or settlements.

**1. Who Is An Insured**

The following are "insureds":

**a.** You for any covered "auto".

**b.** Anyone else while using with your permission a covered "auto" you own, hire or borrow except:

**(1)** The owner or any "employee", agent or driver of the owner, or anyone else from whom you hire or borrow a covered "auto".

**(2)** Your "employee" or agent if the covered "auto" is owned by that "employee" or agent or a member of his or her household.

**(3)** Someone using a covered "auto" while he or she is working in a business of selling, servicing, repairing, parking or storing "autos" unless that business is yours.

**(4)** Anyone other than your "employees", partners (if you are a partnership), members (if you are a limited liability company), a lessee or borrower of a covered "auto" or any of their "employees", while moving property to or from a covered "auto".

**(5)** A partner (if you are a partnership), or member (if you are a limited liability company), for a covered "auto" owned by him or her or a member of his or her household.

**c.** The owner or anyone else from whom you hire or borrow a covered "auto" that is a "trailer" while the "trailer" is connected to another covered "auto" that is a power unit, or, if not connected, is being used exclusively in your business.

**d.** The lessor of a covered "auto" that is not a "trailer" or any "employee", agent or driver of the lessor while the "auto" is leased to you under a written agreement if the written agreement between the lessor and you does not require the lessor to hold you harmless and then only when the leased "auto" is used in your business as a "motor carrier" for hire.

**e.** Anyone liable for the conduct of an "insured" described above but only to the extent of that liability.

However, none of the following is an "insured":

**(1)** Any "motor carrier" for hire or his or her agents or "employees", other than you and your "employees":

**(a)** If the "motor carrier" is subject to motor carrier insurance requirements and meets them by a means other than "auto" liability insurance.

**(b)** If the "motor carrier" is not insured for hired "autos" under an "auto" liability insurance form that insures on a primary basis the owners of the "autos" and their agents and "employees" while the "autos" are leased to that "motor carrier" and used in his or her business.

However, Paragraph **(1)** above does not apply if you have leased an "auto" to the for-hire "motor carrier" under a written lease agreement in which you have held that "motor carrier" harmless.

**(2)** Any rail, water or air carrier or its "employees" or agents, other than you and your "employees", for a "trailer" if "bodily injury" or "property damage" or a "covered pollution cost or expense" occurs while the "trailer" is detached from a covered "auto" you are using and:

**(a)** Is being transported by the carrier; or

**(b)** Is being loaded on or unloaded from any unit of transportation by the carrier.

**2. Coverage Extensions**

**a. Supplementary Payments**

We will pay for the "insured":

**(1)** All expenses we incur.

**(2)** Up to $2,000 for the cost of bail bonds (including bonds for related traffic law violations) required because of an "accident" we cover. We do not have to furnish these bonds.

**(3)** The cost of bonds to release attachments in any "suit" against the "insured" we defend, but only for bond amounts within our Limit of Insurance.

**(4)** All reasonable expenses incurred by the "insured" at our request, including actual loss of earnings up to $250 a day because of time off from work.

**(5)** All court costs taxed against the "insured" in any "suit" against the "insured" we defend. However, these payments do not include attorneys' fees or attorneys' expenses taxed against the "insured".

**(6)** All interest on the full amount of any judgment that accrues after entry of the judgment in any "suit" against the "insured" we defend; but our duty to pay interest ends when we have paid, offered to pay or deposited in court the part of the judgment that is within our Limit of Insurance.

These payments will not reduce the Limit of Insurance.

**b. Out-of-state Coverage Extensions**

While a covered "auto" is away from the state where it is licensed, we will:

**(1)** Increase the Limit of Insurance for Covered Autos Liability Coverage to meet the limit specified by a compulsory or financial responsibility law of the jurisdiction where the covered "auto" is being used. This extension does not apply to the limit or limits specified by any law governing "motor carriers" of passengers or property.

**(2)** Provide the minimum amounts and types of other coverages, such as no-fault, required of out-of-state vehicles by the jurisdiction where the covered "auto" is being used.

We will not pay anyone more than once for the same elements of "loss" because of these extensions.

## B. Exclusions

This insurance does not apply to any of the following:

**1. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the "insured".

**2. Contractual**

Liability assumed under any contract or agreement. But this exclusion does not apply to liability for damages:

**a.** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement; or

**b.** That the "insured" would have in the absence of the contract or agreement.

**3. Workers' Compensation**

Any obligation for which the "insured" or the "insured's" insurer may be held liable under any workers' compensation, disability benefits or unemployment compensation law or any similar law.

**4. Employee Indemnification And Employer's Liability**

"Bodily injury" to:

**a.** An "employee" of the "insured" arising out of and in the course of:

**(1)** Employment by the "insured"; or

**(2)** Performing the duties related to the conduct of the "insured's" business; or

**b.** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **a.** above.

This exclusion applies:

**(1)** Whether the "insured" may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

But this exclusion does not apply to "bodily injury" to domestic "employees" not entitled to workers' compensation benefits or to liability assumed by the "insured" under an "insured contract". For the purposes of the Coverage Form, a domestic "employee" is a person engaged in household or domestic work performed principally in connection with a residence premises.

**5. Fellow Employee**

"Bodily injury" to:

**a.** Any fellow "employee" of the "insured" arising out of and in the course of the fellow "employee's" employment or while performing duties related to the conduct of your business; or

**b.** The spouse, child, parent, brother or sister of that fellow "employee" as a consequence of Paragraph **a.** above.

**6. Care, Custody Or Control**

"Property damage" to or "covered pollution cost or expense" involving property owned or transported by the "insured" or in the "insured's" care, custody or control. But this exclusion does not apply to liability assumed under a sidetrack agreement.

**7. Handling Of Property**

"Bodily injury" or "property damage" resulting from the handling of property:

**a.** Before it is moved from the place where it is accepted by the "insured" for movement into or onto the covered "auto"; or

**b.** After it is moved from the covered "auto" to the place where it is finally delivered by the "insured".

**8. Movement Of Property By Mechanical Device**

"Bodily injury" or "property damage" resulting from the movement of property by a mechanical device (other than a hand truck) unless the device is attached to the covered "auto".

**9. Operations**

"Bodily injury" or "property damage" arising out of the operation of:

**a.** Any equipment listed in Paragraphs **6.b.** and **6.c.** of the definition of "mobile equipment"; or

**b.** Machinery or equipment that is on, attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

**10. Completed Operations**

"Bodily injury" or "property damage" arising out of "your work" after that work has been completed or abandoned.

In the exclusion, your work means:

**a.** Work or operations performed by you or on your behalf; and

**b.** Materials, parts or equipment furnished in connection with such work or operations.

Your work includes warranties or representations made at any time with respect to the fitness, quality, durability or performance of any of the items included in Paragraph **a.** or **b.** above.

Your work will be deemed completed at the earliest of the following times:

**(1)** When all of the work called for in your contract has been completed;

**(2)** When all of the work to be done at the site has been completed if your contract calls for work at more than one site; or

**(3)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**11. Pollution**

"Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**a.** That are, or that are contained in any property that is:

**(1)** Being transported or towed by, handled, or handled for movement into, onto or from, the covered "auto";

**(2)** Otherwise in the course of transit by or on behalf of the "insured"; or

**(3)** Being stored, disposed of, treated or processed in or upon the covered "auto";

**b.** Before the "pollutants" or any property in which the "pollutants" are contained are moved from the place where they are accepted by the "insured" for movement into or onto the covered "auto"; or

**c.** After the "pollutants" or any property in which the "pollutants" are contained are moved from the covered "auto" to the place where they are finally delivered, disposed of or abandoned by the "insured".

Paragraph **a.** above does not apply to fuels, lubricants, fluids, exhaust gases or other similar "pollutants" that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the covered "auto" or its parts, if:

**(1)** The "pollutants" escape, seep, migrate, or are discharged, dispersed or released directly from an "auto" part designed by its manufacturer to hold, store, receive or dispose of such "pollutants"; and

**(2)** The "bodily injury", "property damage" or "covered pollution cost or expense" does not arise out of the operation of any equipment listed in Paragraphs **6.b.** and **6.c.** of the definition of "mobile equipment".

Paragraphs **b.** and **c.** above of this exclusion do not apply to "accidents" that occur away from premises owned by or rented to an "insured" with respect to "pollutants" not in or upon a covered "auto" if:

**(a)** The "pollutants" or any property in which the "pollutants" are contained are upset, overturned or damaged as a result of the maintenance or use of a covered "auto"; and

**(b)** The discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused directly by such upset, overturn or damage.

**12. War**

"Bodily injury" or "property damage" arising directly or indirectly out of:

**a.** War, including undeclared or civil war;

**b.** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**c.** Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

**13. Racing**

Covered "autos" while used in any professional or organized racing or demolition contest or stunting activity, or while practicing for such contest or activity. This insurance also does not apply while that covered "auto" is being prepared for such a contest or activity.

**C. Limit Of Insurance**

Regardless of the number of covered "autos", "insureds", premiums paid, claims made or vehicles involved in the "accident", the most we will pay for the total of all damages and "covered pollution cost or expense" combined resulting from any one "accident" is the Limit Of Insurance for Covered Autos Liability Coverage shown in the Declarations.

All "bodily injury", "property damage" and "covered pollution cost or expense" resulting from continuous or repeated exposure to substantially the same conditions will be considered as resulting from one "accident".

No one will be entitled to receive duplicate payments for the same elements of "loss" under this Coverage Form and any Medical Payments Coverage endorsement, Uninsured Motorists Coverage endorsement or Underinsured Motorists Coverage endorsement attached to this Coverage Part.

**SECTION III – TRAILER INTERCHANGE COVERAGE**

**A. Coverage**

**1.** We will pay all sums you legally must pay as damages because of "loss" to a "trailer" you don't own or its equipment under:

**a. Comprehensive Coverage**

From any cause except:

**(1)** The "trailer's" collision with another object; or

**(2)** The "trailer's" overturn.

**b. Specified Causes Of Loss Coverage**

Caused by:

**(1)** Fire, lightning or explosion;

**(2)** Theft;

**(3)** Windstorm, hail or earthquake;

**(4)** Flood;

**(5)** Mischief or vandalism; or

**(6)** The sinking, burning, collision or derailment of any conveyance transporting the "trailer".

**c. Collision Coverage**

Caused by:

**(1)** The "trailer's" collision with another object; or

**(2)** The "trailer's" overturn.

© Insurance Services Office, Inc., 2011

**2.** We have the right and duty to defend any "insured" against a "suit" asking for these damages. However, we have no duty to defend any "insured" against a "suit" seeking damages for any "loss" to which this insurance does not apply. We may investigate and settle any claim or "suit" as we consider appropriate. Our duty to defend or settle ends for a coverage when the Limit of Insurance for that coverage has been exhausted by payment of judgments or settlements.

**3. Coverage Extensions**

The following apply as **Supplementary Payments.** We will pay for you:

**a.** All expenses we incur.

**b.** The cost of bonds to release attachments, but only for bond amounts within our Limit of Insurance.

**c.** All reasonable expenses incurred at our request, including actual loss of earnings up to $250 a day because of time off from work.

**d.** All court costs taxed against the "insured" in any "suit" against the "insured" we defend. However, these payments do not include attorneys' fees or attorneys' expenses taxed against the "insured".

**e.** All interest on the full amount of any judgment that accrues after entry of the judgment; but our duty to pay interest ends when we have paid, offered to pay, or deposited in court the part of the judgment that is within our Limit of Insurance.

These payments will not reduce the Limit of Insurance.

**B. Exclusions**

**1.** We will not pay for "loss" caused by or resulting from any of the following. Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss".

**a. Nuclear Hazard**

**(1)** The explosion of any weapon employing atomic fission or fusion; or

**(2)** Nuclear reaction or radiation, or radioactive contamination, however caused.

**b. War Or Military Action**

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

**2.** We will not pay for loss of use.

**3. Other Exclusions**

We will not pay for "loss" due and confined to:

**a.** Wear and tear, freezing, mechanical or electrical breakdown.

**b.** Blowouts, punctures or other road damage to tires.

This exclusion does not apply to such "loss" resulting from the total theft of a covered "auto".

**C. Limits Of Insurance**

The most we will pay for "loss" to any one "trailer" is the least of the following amounts:

**1.** The actual cash value of the damaged or stolen property at the time of the "loss";

**2.** The cost of repairing or replacing the damaged or stolen property with other property of like kind and quality; or

**3.** The Limit Of Insurance shown in the Declarations.

**D. Deductible**

For each covered "trailer", our obligation to pay:

**1.** The actual cash value of the damaged or stolen property at the time of the "loss" will be reduced by the applicable deductible shown in the Declarations.

**2.** The cost of repairing or replacing the damaged or stolen property with other property of like kind and quality will be reduced by the applicable deductible shown in the Declarations.

**3.** The damages for "loss" that would otherwise be payable will be reduced by the applicable deductible shown in the Declarations prior to the application of the Limit Of Insurance shown in the Declarations.

**SECTION IV – PHYSICAL DAMAGE COVERAGE**

**A. Coverage**

1. We will pay for "loss" to a covered "auto" or its equipment under:

   **a. Comprehensive Coverage**

   From any cause except:

   **(1)** The covered "auto's" collision with another object; or

   **(2)** The covered "auto's" overturn.

   **b. Specified Causes Of Loss Coverage**

   Caused by:

   **(1)** Fire, lightning or explosion;

   **(2)** Theft;

   **(3)** Windstorm, hail or earthquake;

   **(4)** Flood;

   **(5)** Mischief or vandalism; or

   **(6)** The sinking, burning, collision or derailment of any conveyance transporting the covered "auto".

   **c. Collision Coverage**

   Caused by:

   **(1)** The covered "auto's" collision with another object; or

   **(2)** The covered "auto's" overturn.

2. **Towing – Private Passenger Type Autos**

   We will pay up to the limit shown in the Declarations for towing and labor costs incurred each time a covered "auto" of the "private passenger type" is disabled. However, the labor must be performed at the place of disablement.

3. **Glass Breakage – Hitting A Bird Or Animal – Falling Objects Or Missiles**

   If you carry Comprehensive Coverage for the damaged covered "auto", we will pay for the following under Comprehensive Coverage:

   **a.** Glass breakage;

   **b.** "Loss" caused by hitting a bird or animal; and

   **c.** "Loss" caused by falling objects or missiles.

   However, you have the option of having glass breakage caused by a covered "auto's" collision or overturn considered a "loss" under Collision Coverage.

4. **Coverage Extension**

   **a. Transportation Expenses**

   We will also pay up to $20 per day to a maximum of $600 for temporary transportation expense incurred by you because of the total theft of a covered "auto" of the "private passenger type". We will pay only for those covered "autos" for which you carry either Comprehensive or Specified Causes Of Loss Coverage. We will pay for temporary transportation expenses incurred during the period beginning 48 hours after the theft and ending, regardless of the policy's expiration, when the covered "auto" is returned to use or we pay for its "loss".

   **b. Loss Of Use Expenses**

   For Hired Auto Physical Damage, we will pay expenses for which an "insured" becomes legally responsible to pay for loss of use of a vehicle rented or hired without a driver, under a written rental contract or agreement. We will pay for loss of use expenses if caused by:

   **(1)** Other than collision only if the Declarations indicates that Comprehensive Coverage is provided for any covered "auto";

   **(2)** Specified Causes Of Loss only if the Declarations indicates that Specified Causes Of Loss Coverage is provided for any covered "auto"; or

   **(3)** Collision only if the Declarations indicates that Collision Coverage is provided for any covered "auto".

   However, the most we will pay for any expenses for loss of use is $20 per day, to a maximum of $600.

**B. Exclusions**

1. We will not pay for "loss" caused by or resulting from any of the following. Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss".

   **a. Nuclear Hazard**

   **(1)** The explosion of any weapon employing atomic fission or fusion; or

   **(2)** Nuclear reaction or radiation, or radioactive contamination, however caused.

 © Insurance Services Office, Inc., 2011 CA 00 20 10 13

**b. War Or Military Action**

   **(1)** War, including undeclared or civil war;

   **(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

   **(3)** Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

**2.** We will not pay for "loss" to any of the following:

  **a.** Any covered "auto" while in anyone else's possession under a written "trailer" interchange agreement. But this exclusion does not apply to a loss payee; however, if we pay the loss payee, you must reimburse us for our payment.

  **b.** Any covered "auto" while used in any professional or organized racing or demolition contest or stunting activity, or while practicing for such contest or activity. We will also not pay for "loss" to any covered "auto" while that covered "auto" is being prepared for such a contest or activity.

  **c.** Tapes, records, discs or similar audio, visual or data electronic devices designed for use with audio, visual or data electronic equipment.

  **d.** Any device designed or used to detect speed-measuring equipment, such as radar or laser detectors, and any jamming apparatus intended to elude or disrupt speed-measuring equipment.

  **e.** Any electronic equipment, without regard to whether this equipment is permanently installed, that reproduces, receives or transmits audio, visual or data signals.

  **f.** Any accessories used with the electronic equipment described in Paragraph **e.** above.

**3.** Exclusions **2.e.** and **2.f.** do not apply to equipment designed to be operated solely by use of the power from the "auto's" electrical system that, at the time of "loss", is:

  **a.** Permanently installed in or upon the covered "auto";

  **b.** Removable from a housing unit which is permanently installed in or upon the covered "auto";

**c.** An integral part of the same unit housing any electronic equipment described in Paragraphs **a.** and **b.** above; or

**d.** Necessary for the normal operation of the "auto" or the monitoring of the "auto's" operating system.

**4.** We will not pay for "loss" due and confined to:

  **a.** Wear and tear, freezing, mechanical or electrical breakdown.

  **b.** Blowouts, punctures or other road damage to tires.

  This exclusion does not apply to "loss" resulting from the total theft of a covered "auto".

**5.** We will not pay for "loss" to a covered "auto" due to "diminution in value".

**C. Limits Of Insurance**

**1.** The most we will pay for:

  **a.** "Loss" to any one covered "auto" is the lesser of:

   **(1)** The actual cash value of the damaged or stolen property as of the time of the "loss"; or

   **(2)** The cost of repairing or replacing the damaged or stolen property with other property of like kind and quality.

  **b.** All electronic equipment that reproduces, receives or transmits audio, visual or data signals in any one "loss" is $1,000, if, at the time of "loss", such electronic equipment is:

   **(1)** Permanently installed in or upon the covered "auto" in a housing, opening or other location that is not normally used by the "auto" manufacturer for the installation of such equipment;

   **(2)** Removable from a permanently installed housing unit as described in Paragraph **b.(1)** above; or

   **(3)** An integral part of such equipment as described in Paragraphs **b.(1)** and **b.(2)** above.

**2.** An adjustment for depreciation and physical condition will be made in determining actual cash value in the event of a total "loss".

**3.** If a repair or replacement results in better than like kind or quality, we will not pay for the amount of the betterment.

**D. Deductible**

For each covered "auto", our obligation to pay for, repair, return or replace damaged or stolen property will be reduced by the applicable deductible shown in the Declarations. Any Comprehensive Coverage deductible shown in the Declarations does not apply to "loss" caused by fire or lightning.

**SECTION V – MOTOR CARRIER CONDITIONS**

The following conditions apply in addition to the Common Policy Conditions:

**A. Loss Conditions**

**1. Appraisal For Physical Damage Loss**

If you and we disagree on the amount of "loss", either may demand an appraisal of the "loss". In this event, each party will select a competent appraiser. The two appraisers will select a competent and impartial umpire. The appraisers will state separately the actual cash value and amount of "loss". If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If we submit to an appraisal, we will still retain our right to deny the claim.

**2. Duties In The Event Of Accident, Claim, Suit Or Loss**

We have no duty to provide coverage under this policy unless there has been full compliance with the following duties:

**a.** In the event of "accident", claim, "suit" or "loss", you must give us or our authorized representative prompt notice of the "accident" or "loss". Include:

**(1)** How, when and where the "accident" or "loss" occurred;

**(2)** The "insured's" name and address; and

**(3)** To the extent possible, the names and addresses of any injured persons and witnesses.

**b.** Additionally, you and any other involved "insured" must:

**(1)** Assume no obligation, make no payment or incur no expense without our consent, except at the "insured's" own cost.

**(2)** Immediately send us copies of any request, demand, order, notice, summons or legal paper received concerning the claim or "suit".

**(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit".

**(4)** Authorize us to obtain medical records or other pertinent information.

**(5)** Submit to examination at our expense, by physicians of our choice, as often as we reasonably require.

**c.** If there is a "loss" to a covered "auto" or its equipment, you must also do the following:

**(1)** Promptly notify the police if the covered "auto" or any of its equipment is stolen.

**(2)** Take all reasonable steps to protect the covered "auto" from further damage. Also keep a record of your expenses for consideration in the settlement of the claim.

**(3)** Permit us to inspect the covered "auto" and records proving the "loss" before its repair or disposition.

**(4)** Agree to examination under oath at our request and give us a signed statement of your answers.

**3. Legal Action Against Us**

No one may bring a legal action against us under this Coverage Form until:

**a.** There has been full compliance with all the terms of this Coverage Form; and

**b.** Under Covered Autos Liability Coverage, we agree in writing that the "insured" has an obligation to pay or until the amount of that obligation has finally been determined by judgment after trial. No one has the right under this policy to bring us into an action to determine the "insured's" liability.

**4. Loss Payment – Physical Damage Coverages**

At our option, we may:

**a.** Pay for, repair or replace damaged or stolen property;

**b.** Return the stolen property at our expense. We will pay for any damage that results to the "auto" from the theft; or

**c.** Take all or any part of the damaged or stolen property at an agreed or appraised value.

If we pay for the "loss", our payment will include the applicable sales tax for the damaged or stolen property.

**5. Transfer Of Rights Of Recovery Against Others To Us**

If any person or organization to or for whom we make payment under this Coverage Form has rights to recover damages from another, those rights are transferred to us. That person or organization must do everything necessary to secure our rights and must do nothing after "accident" or "loss" to impair them.

**B. General Conditions**

**1. Bankruptcy**

Bankruptcy or insolvency of the "insured" or the "insured's" estate will not relieve us of any obligation under this Coverage Form.

**2. Concealment, Misrepresentation Or Fraud**

This Coverage Form is void in any case of fraud by you at any time as it relates to this Coverage Form. It is also void if you or any other "insured", at any time, intentionally conceals or misrepresents a material fact concerning:

**a.** This Coverage Form;

**b.** The covered "auto";

**c.** Your interest in the covered "auto"; or

**d.** A claim under this Coverage Form.

**3. Liberalization**

If we revise this Coverage Form to provide more coverage without additional premium charge, your policy will automatically provide the additional coverage as of the day the revision is effective in your state.

**4. No Benefit To Bailee – Physical Damage Coverages**

We will not recognize any assignment or grant any coverage for the benefit of any person or organization holding, storing or transporting property for a fee regardless of any other provision of this Coverage Form.

**5. Other Insurance – Primary And Excess Insurance Provisions**

**a.** While any covered "auto" is hired or borrowed from you by another "motor carrier", this Coverage Form's Covered Autos Liability Coverage is:

**(1)** Primary if a written agreement between you as the lessor and the other "motor carrier" as the lessee requires you to hold the lessee harmless; or

**(2)** Excess over any other collectible insurance if a written agreement between you as the lessor and the other "motor carrier" as the lessee does not require you to hold the lessee harmless.

**b.** While any covered "auto" is hired or borrowed by you from another "motor carrier", this Coverage Form's Covered Autos Liability Coverage is:

**(1)** Primary if a written agreement between the other "motor carrier" as the lessor and you as the lessee does not require the lessor to hold you harmless, and then only while the covered "auto" is used exclusively in your business as a "motor carrier" for hire.

**(2)** Excess over any other collectible insurance if a written agreement between the other "motor carrier" as the lessor and you as the lessee requires the lessor to hold you harmless.

**c.** While a covered "auto" which is a "trailer" is connected to a power unit, this Coverage Form's Covered Autos Liability Coverage is:

**(1)** Provided on the same basis, either primary or excess, as the Covered Autos Liability Coverage provided for the power unit if the power unit is a covered "auto".

**(2)** Excess if the power unit is not a covered "auto".

**d.** Any Trailer Interchange Coverage provided by this Coverage Form is primary for any covered "auto".

**e.** Except as provided in Paragraphs **a., b., c.** and **d.** above, this Coverage Form provides primary insurance for any covered "auto" you own and excess insurance for any covered "auto" you don't own.

**f.** For Hired Auto Physical Damage Coverage, any covered "auto" you lease, hire, rent or borrow is deemed to be a covered "auto" you own. However, any "auto" that is leased, hired, rented or borrowed with a driver is not a covered "auto".

**g.** Regardless of the provisions of Paragraphs **a., b., c., d.** and **e.** above, this Coverage Form's Covered Autos Liability Coverage is primary for any liability assumed under an "insured contract".

**h.** When this Coverage Form and any other Coverage Form or policy covers on the same basis, either excess or primary, we will pay only our share. Our share is the proportion that the Limit of Insurance of our Coverage Form bears to the total of the limits of all the Coverage Forms and policies covering on the same basis.

## 6. Premium Audit

**a.** The estimated premium for this Coverage Form is based on the exposures you told us you would have when this policy began. We will compute the final premium due when we determine your actual exposures. The estimated total premium will be credited against the final premium due and the first Named Insured will be billed for the balance, if any. The due date for the final premium or retrospective premium is the date shown as the due date on the bill. If the estimated total premium exceeds the final premium due, the first Named Insured will get a refund.

**b.** If this policy is issued for more than one year, the premium for this Coverage Form will be computed annually based on our rates or premiums in effect at the beginning of each year of the policy.

## 7. Policy Period, Coverage Territory

Under this Coverage Form, we cover "accidents" and "losses" occurring:

**a.** During the policy period shown in the Declarations; and

**b.** Within the coverage territory.

The coverage territory is:

**(1)** The United States of America;

**(2)** The territories and possessions of the United States of America;

**(3)** Puerto Rico;

**(4)** Canada; and

**(5)** Anywhere in the world if a covered "auto" of the "private passenger type" is leased, hired, rented or borrowed without a driver for a period of 30 days or less,

provided that the "insured's" responsibility to pay damages is determined in a "suit" on the merits, in the United States of America, the territories and possessions of the United States of America, Puerto Rico or Canada, or in a settlement we agree to.

We also cover "loss" to, or "accidents" involving, a covered "auto" while being transported between any of these places.

## 8. Two Or More Coverage Forms Or Policies Issued By Us

If this Coverage Form and any other Coverage Form or policy issued to you by us or any company affiliated with us apply to the same "accident", the aggregate maximum Limit of Insurance under all the Coverage Forms or policies shall not exceed the highest applicable Limit of Insurance under any one Coverage Form or policy. This condition does not apply to any Coverage Form or policy issued by us or an affiliated company specifically to apply as excess insurance over this Coverage Form.

## SECTION VI – DEFINITIONS

**A.** "Accident" includes continuous or repeated exposure to the same conditions resulting in "bodily injury" or "property damage".

**B.** "Auto" means:

**1.** A land motor vehicle, "trailer" or semitrailer designed for travel on public roads; or

**2.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

**C.** "Bodily injury" means bodily injury, sickness or disease sustained by a person including death resulting from any of these.

**D.** "Covered pollution cost or expense" means any cost or expense arising out of:

**1.** Any request, demand, order or statutory or regulatory requirement that any "insured" or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**2.** Any claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

 © Insurance Services Office, Inc., 2011

"Covered pollution cost or expense" does not include any cost or expense arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**a.** That are, or that are contained in any property that is:

**(1)** Being transported or towed by, handled, or handled for movement into, onto or from the covered "auto";

**(2)** Otherwise in the course of transit by or on behalf of the "insured"; or

**(3)** Being stored, disposed of, treated or processed in or upon the covered "auto";

**b.** Before the "pollutants" or any property in which the "pollutants" are contained are moved from the place where they are accepted by the "insured" for movement into or onto the covered "auto"; or

**c.** After the "pollutants" or any property in which the "pollutants" are contained are moved from the covered "auto" to the place where they are finally delivered, disposed of or abandoned by the "insured".

Paragraph **a.** above does not apply to fuels, lubricants, fluids, exhaust gases or other similar "pollutants" that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the covered "auto" or its parts, if:

**(1)** The "pollutants" escape, seep, migrate or are discharged, dispersed or released directly from an "auto" part designed by its manufacturer to hold, store, receive or dispose of such "pollutants"; and

**(2)** The "bodily injury", "property damage" or "covered pollution cost or expense" does not arise out of the operation of any equipment listed in Paragraph **6.b.** or **6.c.** of the definition of "mobile equipment".

Paragraphs **b.** and **c.** above do not apply to "accidents" that occur away from premises owned by or rented to an "insured" with respect to "pollutants" not in or upon a covered "auto", if:

**(a)** The "pollutants" or any property in which the "pollutants" are contained are upset, overturned or damaged as a result of the maintenance or use of a covered "auto"; and

**(b)** The discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused directly by such upset, overturn or damage.

**E.** "Diminution in value" means the actual or perceived loss in market value or resale value which results from a direct and accidental "loss".

**F.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**G.** "Insured" means any person or organization qualifying as an insured in the Who Is An Insured provision of the applicable coverage. Except with respect to the Limit of Insurance, the coverage afforded applies separately to each insured who is seeking coverage or against whom a claim or "suit" is brought.

**H.** "Insured contract" means:

**1.** A lease of premises;

**2.** A sidetrack agreement;

**3.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**4.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**5.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another to pay for "bodily injury" or "property damage" to a third party or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement; or

**6.** That part of any other contract or agreement, entered into, as part of your business, pertaining to the rental or lease, by you or any of your "employees", of any "auto". However, such contract or agreement shall not be considered an "insured contract" to the extent that it obligates you or any of your "employees" to pay for "property damage" to any "auto" rented or leased by you or any of your "employees".

An "insured contract" does not include that part of any contract or agreement:

**a.** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing;

 © Insurance Services Office, Inc., 2011

**b.** That pertains to the loan, lease or rental of an "auto" to you or any of your employees, if the "auto" is loaned, leased or rented with a driver; or

**c.** That holds a person or organization engaged in the business of transporting property by "auto" for hire harmless for your use of a covered "auto" unless the covered "auto" is used in your business as a "motor carrier" for hire as in Section **II**, Paragraph **A.1.d.** of the Who Is An Insured provision.

**I.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**J.** "Loss" means direct and accidental loss or damage.

**K.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

**1.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

**2.** Vehicles maintained for use solely on or next to premises you own or rent;

**3.** Vehicles that travel on crawler treads;

**4.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

**a.** Power cranes, shovels, loaders, diggers or drills; or

**b.** Road construction or resurfacing equipment such as graders, scrapers or rollers;

**5.** Vehicles not described in Paragraph **1., 2., 3.** or **4.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

**a.** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well-servicing equipment; or

**b.** Cherry pickers and similar devices used to raise or lower workers; or

**6.** Vehicles not described in Paragraph **1., 2., 3.** or **4.** above, maintained primarily for purposes other than the transportation of persons or cargo. However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

**a.** Equipment designed primarily for:

**(1)** Snow removal;

**(2)** Road maintenance, but not construction or resurfacing; or

**(3)** Street cleaning;

**b.** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

**c.** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting or well-servicing equipment.

However, "mobile equipment" does not include land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**L.** "Motor carrier" means a person or organization providing transportation by "auto" in the furtherance of a commercial enterprise.

**M.** "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**N.** "Private passenger type" means a private passenger or station wagon type "auto" and includes an "auto" of the pickup or van type if not used for business purposes.

**O.** "Property damage" means damage to or loss of use of tangible property.

**P.** "Suit" means a civil proceeding in which:

**1.** Damages because of "bodily injury" or "property damage"; or

**2.** A "covered pollution cost or expense",

to which this insurance applies, are alleged.

"Suit" includes:

    **a.** An arbitration proceeding in which such damages or "covered pollution costs or expenses" are claimed and to which the "insured" must submit or does submit with our consent; or

    **b.** Any other alternative dispute resolution proceeding in which such damages or "covered pollution costs or expenses" are claimed and to which the "insured" submits with our consent.

**Q.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**R.** "Trailer" includes a semitrailer or a dolly used to convert a semitrailer into a trailer. But for Trailer Interchange Coverage only, "trailer" also includes a container.

© Insurance Services Office, Inc., 2011

**IL N 129 02 06**

# PENNSYLVANIA AUTO FRAUD STATEMENT

Any person who knowingly and with intent to injure or defraud any insurer files an application or claim containing any false, incomplete or misleading information shall, upon conviction, be subject to imprisonment for up to seven years and payment of a fine of up to $15,000.

COMMERCIAL AUTO
CA 01 80 06 16

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# PENNSYLVANIA CHANGES

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
MOTOR CARRIER COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

**A. Changes In Covered Autos Liability Coverage**

The following is added to Paragraph **2.a. Supplementary Payments:**

Prejudgment interest awarded against the "insured" on the part of the judgment we pay. Any prejudgment interest awarded against the "insured" is subject to the applicable Pennsylvania Rules of Civil Procedure.

**B. Changes In Conditions**

1. Paragraph **2.b.(5)** of the **Duties In The Event Of An Accident, Claim, Suit Or Loss** Condition is replaced by the following:

   **(5)** After we show good cause, submit to examination at our expense, by physicians of our choice.

2. The following is added to Paragraph **5. Transfer Of Rights Of Recovery Against Others To Us** Condition:

   If we make any payment due to an "accident" and the "insured" recovers from another party in a separate claim or "suit", the "insured" shall hold the proceeds in trust for us and pay us back the amount we have paid less reasonable attorneys' fees, costs and expenses incurred by the "insured" to the extent such payment duplicates any amount we have paid under this coverage.

3. The following paragraph is added to the **Other Insurance** Condition:

   If you are a motor vehicle dealer as defined in the Pennsylvania Board of Vehicles Act, 63 Pa. Stat. Ann. § 818.2, then:

   **a.** For any "auto" you own, which is loaned to a customer as a temporary substitute for an "auto" insured under a "customer's private passenger automobile insurance policy" which is out of use because it is being transported, serviced, repaired or inspected, Covered Autos Liability, but only with respect to damages because of "bodily injury" and Physical Damage Coverage provided by this Coverage Form shall be excess in the event of an "accident" or "loss".

   **b.** For any "auto" insured under your "customer's private passenger automobile insurance policy", while it is being transported, serviced, repaired or inspected by you or your "employee":

   **(1)** Covered Autos Liability, but only with respect to damages because of "bodily injury";

© Insurance Services Office, Inc., 2016

**(2)** Comprehensive Coverage;

**(3)** Specified Cause Of Loss Coverage; and/or

**(4)** Collision Coverage;

provided by this Coverage Form shall be primary in the event of an "accident" or "loss".

**4.** The following is added to Paragraph **B. General Conditions:**

**a. Constitutionality Clause**

The premium for, and the coverages of, this Coverage Form have been established in reliance upon the provisions of the Pennsylvania Motor Vehicle Financial Responsibility Law. In the event a court, from which there is no appeal, declares or enters a judgment, the effect of which is to render the provisions of such statute invalid or unenforceable in whole or in part, we shall have the right to recompute the premium payable for the Coverage Form and void or amend the provisions of the Coverage Form, subject to the approval of the Insurance Commissioner.

**b. Conformity Clause**

If you are a motor vehicle dealer as defined in the Pennsylvania Board of Vehicles Act, 63 Pa. Stat. Ann. § 818.2, then whenever an "auto" insured under your "customer's private passenger automobile insurance policy" is being transported, serviced, repaired or inspected by you or your "employee":

**(1)** The provisions of the:

**(a)** Covered Autos Liability, but only with respect to damages because of "bodily injury";

**(b)** Comprehensive Coverage;

**(c)** Specified Cause Of Loss Coverage; and/or

**(d)** Collision Coverage;

provided by this Coverage Form are hereby amended to conform to 40 Pa. Stat. Ann. § 991.2007a; and

**(2)** Pursuant to 40 Pa. Stat. Ann. § 991.2007a, the Limits Of Insurance provided in the Schedule or in the Declarations are hereby increased as needed to an amount equal to the:

**(a)** Applicable limit(s);

**(b)** Actual cash value; and/or

**(c)** Amount necessary to repair or replace the property with other property of like kind and quality;

set forth in the "customer's private passenger automobile insurance policy".

**C. Changes In Definitions**

For motor vehicle dealers as defined in the Pennsylvania Board of Vehicles Act, 63 Pa. Stat. Ann. § 818.2, the following definition is added:

"Customer's private passenger automobile insurance policy" means a private passenger automobile insurance policy that:

**1.** Is currently in effect; and

**2.** Lists an "auto" owned by your customer or a "customer's auto" in the Declarations.

© Insurance Services Office, Inc., 2016
CA 01 80 06 16

IL 00 21 09 08

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

1. The insurance does not apply:

   **A.** Under any Liability Coverage, to "bodily injury" or "property damage":

      **(1)** With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

      **(2)** Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   **B.** Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

   **C.** Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

      **(1)** The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or **(b)** has been discharged or dispersed therefrom;

      **(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

      **(3)** The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

2. As used in this endorsement:

   "Hazardous properties" includes radioactive, toxic or explosive properties.

   "Nuclear material" means "source material", "special nuclear material" or "by-product material".

 © ISO Properties, Inc., 2007

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

**(a)** Any "nuclear reactor";

**(b)** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";

**(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

**(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

 © ISO Properties, Inc., 2007 IL 00 21 09 08   □

IL 01 20 10 13

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# PENNSYLVANIA CHANGES – DEFENSE COSTS

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART – LEGAL LIABILITY COVERAGE FORM
COMMERCIAL PROPERTY COVERAGE PART – MORTGAGEHOLDER'S ERRORS AND OMISSIONS
COVERAGE FORM
ELECTRONIC DATA LIABILITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
FARM COVERAGE PART
FARM UMBRELLA LIABILITY POLICY
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCT WITHDRAWAL COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK COVERAGE PART

**A.** The provisions of Paragraph **B.** are added to all Insuring Agreements that set forth a duty to defend under:

**1.** Section **I** of the Commercial General Liability, Commercial Liability Umbrella, Electronic Data Liability, Employment-related Practices Liability, Farm, Liquor Liability, Medical Professional Liability, Owners And Contractors Protective Liability, Pollution Liability, Product Withdrawal, Products/Completed Operations Liability, Railroad Protective Liability and Underground Storage Tank Coverage Parts, Auto Dealers Coverage Form and the Farm Umbrella Liability Policy;

**2.** Section **II** under the Auto Dealers, Business Auto and Motor Carrier Coverage Forms;

**3.** Section **III** under the Auto Dealers and Motor Carrier Coverage Forms;

**4.** Section **A.** Coverage under the Legal Liability Coverage Form; and

**5.** Coverage **C** – Mortgageholder's Liability under the Mortgageholder's Errors And Omissions Coverage Form.

Paragraph **B.** also applies to any other provision in the policy that sets forth a duty to defend.

**B.** If we initially defend an insured ("insured") or pay for an insured's ("insured's") defense but later determine that none of the claims ("claims"), for which we provided a defense or defense costs, are covered under this insurance, we have the right to reimbursement for the defense costs we have incurred.

The right to reimbursement under this provision will only apply to the costs we have incurred after we notify you in writing that there may not be coverage and that we are reserving our rights to terminate the defense or the payment of defense costs and to seek reimbursement for defense costs.

   © Insurance Services Office, Inc., 2013

IL 02 46 09 07

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# PENNSYLVANIA CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
FARM UMBRELLA LIABILITY POLICY
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** The **Cancellation** Common Policy Condition is replaced by the following:

**CANCELLATION**

**1.** The first Named Insured shown in the Declarations may cancel this policy by writing or giving notice of cancellation.

**2. Cancellation Of Policies In Effect For Less Than 60 Days**

We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least 30 days before the effective date of cancellation.

**3. Cancellation Of Policies In Effect For 60 Days Or More**

If this policy has been in effect for 60 days or more or if this policy is a renewal of a policy we issued, we may cancel this policy only for one or more of the following reasons:

**a.** You have made a material misrepresentation which affects the insurability of the risk. Notice of cancellation will be mailed or delivered at least 15 days before the effective date of cancellation.

**b.** You have failed to pay a premium when due, whether the premium is payable directly to us or our agents or indirectly under a premium finance plan or extension of credit. Notice of cancellation will be mailed at least 15 days before the effective date of cancellation.

**c.** A condition, factor or loss experience material to insurability has changed substantially or a substantial condition, factor or loss experience material to insurability has become known during the policy period. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

**d.** Loss of reinsurance or a substantial decrease in reinsurance has occurred, which loss or decrease, at the time of cancellation, shall be certified to the Insurance Commissioner as directly affecting in-force policies. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

© ISO Properties, Inc., 2006 ☐

**e.** Material failure to comply with policy terms, conditions or contractual duties. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

**f.** Other reasons that the Insurance Commissioner may approve. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

This policy may also be cancelled from inception upon discovery that the policy was obtained through fraudulent statements, omissions or concealment of facts material to the acceptance of the risk or to the hazard assumed by us.

**4.** We will mail or deliver our notice to the first Named Insured's last mailing address known to us. Notice of cancellation will state the specific reasons for cancellation.

**5.** Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

**6.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata and will be returned within 10 business days after the effective date of cancellation. If the first Named Insured cancels, the refund may be less than pro rata and will be returned within 30 days after the effective date of cancellation. The cancellation will be effective even if we have not made or offered a refund.

**7.** If notice is mailed, it will be by registered or first class mail. Proof of mailing will be sufficient proof of notice.

**B.** The following are added and supersede any provisions to the contrary:

**1. Nonrenewal**

If we decide not to renew this policy, we will mail or deliver written notice of nonrenewal, stating the specific reasons for nonrenewal, to the first Named Insured at least 60 days before the expiration date of the policy.

**2. Increase Of Premium**

If we increase your renewal premium, we will mail or deliver to the first Named Insured written notice of our intent to increase the premium at least 30 days before the effective date of the premium increase.

Any notice of nonrenewal or renewal premium increase will be mailed or delivered to the first Named Insured's last known address. If notice is mailed, it will be by registered or first class mail. Proof of mailing will be sufficient proof of notice.

 © ISO Properties, Inc., 2006 **IL 02 46 09 07**  □

IL 09 10 07 02

# PENNSYLVANIA NOTICE

An Insurance Company, its agents, employees, or service contractors acting on its behalf, may provide services to reduce the likelihood of injury, death or loss. These services may include any of the following or related services incident to the application for, issuance, renewal or continuation of, a policy of insurance:

1. Surveys;

2. Consultation or advice; or

3. Inspections.

The "Insurance Consultation Services Exemption Act" of Pennsylvania provides that the Insurance Company, its agents, employees or service contractors acting on its behalf, is not liable for damages from injury, death or loss occurring as a result of any act or omission by any person in the furnishing of or the failure to furnish these services.

The Act does not apply:

1. If the injury, death or loss occurred during the actual performance of the services and was caused by the negligence of the Insurance Company, its agents, employees or service contractors;

2. To consultation services required to be performed under a written service contract not related to a policy of insurance; or

3. If any acts or omissions of the Insurance Company, its agents, employees or service contractors are judicially determined to constitute a crime, actual malice, or gross negligence.

---

**Instruction to Policy Writers**

Attach the Pennsylvania Notice to all new and renewal certificates insuring risks located in Pennsylvania.

---

COMMERCIAL AUTO
CA 23 01 10 13

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXPLOSIVES

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
MOTOR CARRIER COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

**Covered Autos Liability Coverage** is changed by adding the following exclusion:

This insurance does not apply to:

"Bodily injury" or "property damage" caused by the explosion of explosives you make, sell or transport.

 © Insurance Services Office, Inc., 2011

COMMERCIAL AUTO
CA 23 05 10 13

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# WRONG DELIVERY OF LIQUID PRODUCTS

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
MOTOR CARRIER COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

**Covered Autos Liability Coverage** is changed by adding the following exclusion:

This insurance does not apply to:

"Bodily injury" or "property damage" resulting from the delivery of any liquid into the wrong receptacle or to the wrong address, or from the delivery of one liquid for another, if the "bodily injury" or "property damage" occurs after delivery has been completed.

Delivery is considered completed even if further service or maintenance work, or correction, repair or replacement is required because of wrong delivery.

© Insurance Services Office, Inc., 2011

COMMERCIAL AUTO
CA 23 84 01 06

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION OF TERRORISM

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
BUSINESS AUTO PHYSICAL DAMAGE COVERAGE FORM
GARAGE COVERAGE FORM
MOTOR CARRIER COVERAGE FORM
SINGLE INTEREST AUTOMOBILE PHYSICAL DAMAGE INSURANCE POLICY
TRUCKERS COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

**A.** The following definitions are added and apply under this endorsement wherever the term terrorism, or the phrase any injury, damage, loss or expense, are enclosed in quotation marks:

**1.** "Terrorism" means activities against persons, organizations or property of any nature:

**a.** That involve the following or preparation for the following:

**(1)** Use or threat of force or violence; or

**(2)** Commission or threat of a dangerous act; or

**(3)** Commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; and

**b.** When one or both of the following applies:

**(1)** The effect is to intimidate or coerce a government or the civilian population or any segment thereof, or to disrupt any segment of the economy; or

**(2)** It appears that the intent is to intimidate or coerce a government, or to further political, ideological, religious, social or economic objectives or to express (or express opposition to) a philosophy or ideology.

**2.** "Any injury, damage, loss or expense" means any injury, damage, loss or expense covered under any Coverage Form or Policy to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal injury", "personal and advertising injury", "loss", loss of use, rental reimbursement after "loss" or "covered pollution cost or expense", as may be defined under this Coverage Form, Policy or any applicable endorsement.

**B.** Except with respect to Physical Damage Coverage, Trailer Interchange Coverage, Garagekeepers Coverage, Garagekeepers Coverage – Customers' Sound Receiving Equipment or the Single Interest Automobile Physical Damage Insurance Policy, the following exclusion is added:

**EXCLUSION OF TERRORISM**

We will not pay for "any injury, damage, loss or expense" caused directly or indirectly by "terrorism", including action in hindering or defending against an actual or expected incident of "terrorism". "Any injury, damage, loss or expense" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to such injury, damage, loss or expense. **But this exclusion applies only when one or more of the following are attributed to an incident of "terrorism":**

**1.** The "terrorism" is carried out by means of the dispersal or application of radioactive material, or through the use of a nuclear weapon or device that involves or produces a nuclear reaction, nuclear radiation or radioactive contamination; or

© ISO Properties, Inc., 2004

**2.** Radioactive material is released, and it appears that one purpose of the "terrorism" was to release such material; or

**3.** The "terrorism" is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

**4.** Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the "terrorism" was to release such materials; or

**5.** The total of insured damage to all types of property exceeds $25,000,000. In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the "terrorism" and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions; or

**6.** Fifty or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:

   **a.** Physical injury that involves a substantial risk of death; or

   **b.** Protracted and obvious physical disfigurement; or

   **c.** Protracted loss of or impairment of the function of a bodily member or organ.

Multiple incidents of "terrorism" which occur within a 72-hour period and appear to be carried out in concert or to have a related purpose or common leadership will be deemed to be one incident, for the purpose of determining whether the thresholds in Paragraphs **B.5.** and **B.6.** are exceeded.

With respect to this Exclusion, Paragraphs **B.5.** and **B.6.** describe the thresholds used to measure the magnitude of an incident of "terrorism" and the circumstances in which the threshold will apply, for the purpose of determining whether this Exclusion will apply to that incident. When the Exclusion applies to an incident of "terrorism", there is no coverage under this Coverage Form, Policy or any applicable endorsement.

**C.** With respect to Physical Damage Coverage, Trailer Interchange Coverage, Garagekeepers Coverage, Garagekeepers Coverage – Customers' Sound Receiving Equipment or the Single Interest Automobile Physical Damage Insurance Policy, the following exclusion is added:

**EXCLUSION OF TERRORISM**

We will not pay for any "loss", loss of use or rental reimbursement after "loss" caused directly or indirectly by "terrorism", including action in hindering or defending against an actual or expected incident of "terrorism". **But this exclusion applies only when one or more of the following are attributed to an incident of "terrorism":**

**1.** The "terrorism" is carried out by means of the dispersal or application of radioactive material, or through the use of a nuclear weapon or device that involves or produces a nuclear reaction, nuclear radiation or radioactive contamination; or

**2.** Radioactive material is released, and it appears that one purpose of the "terrorism" was to release such material; or

**3.** The "terrorism" is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

**4.** Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the "terrorism" was to release such materials; or

**5.** The total of insured damage to all types of property exceeds $25,000,000. In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the "terrorism" and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions.

Multiple incidents of "terrorism" which occur within a 72-hour period and appear to be carried out in concert or to have a related purpose or common leadership will be deemed to be one incident, for the purpose of determining whether the threshold in Paragraph **C.5.** is exceeded.

 © ISO Properties, Inc., 2004 CA 23 84 01 06 ☐

With respect to this Exclusion, Paragraph **C.5.** describes the threshold used to measure the magnitude of an incident of "terrorism" and the circumstances in which the threshold will apply, for the purpose of determining whether this Exclusion will apply to that incident. When the Exclusion applies to an incident of "terrorism", there is no coverage under this Coverage Form, Policy or any applicable endorsement.

**D.** In the event of any incident of "terrorism" that is not subject to the Exclusion in Paragraphs **B.** or **C.,** coverage does not apply to "any injury, damage, loss or expense" that is otherwise excluded under this Coverage Form, Policy or any applicable endorsement.

© ISO Properties, Inc., 2004

COMMERCIAL AUTO
CA 23 86 01 06

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION OF TERRORISM ABOVE MINIMUM STATUTORY LIMITS

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
BUSINESS AUTO PHYSICAL DAMAGE COVERAGE FORM
GARAGE COVERAGE FORM
MOTOR CARRIER COVERAGE FORM
SINGLE INTEREST AUTOMOBILE PHYSICAL DAMAGE INSURANCE POLICY
TRUCKERS COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

**A.** The following definitions are added and apply under this endorsement wherever the term terrorism, or the phrase any injury, damage, loss or expense, are enclosed in quotation marks:

**1.** "Terrorism" means activities against persons, organizations or property of any nature:

  **a.** That involve the following or preparation for the following:

    **(1)** Use or threat of force or violence; or

    **(2)** Commission or threat of a dangerous act; or

    **(3)** Commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; and

  **b.** When one or both of the following applies:

    **(1)** The effect is to intimidate or coerce a government or the civilian population or any segment thereof, or to disrupt any segment of the economy; or

    **(2)** It appears that the intent is to intimidate or coerce a government, or to further political, ideological, religious, social or economic objectives or to express (or express opposition to) a philosophy or ideology.

**2.** "Any injury, damage, loss or expense" means any injury, damage, loss or expense covered under any Coverage Form or Policy to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal injury", "personal and advertising injury", "loss", loss of use, rental reimbursement after "loss" or "covered pollution cost or expense", as may be defined under this Coverage Form, Policy or any applicable endorsement.

**B.** Except with respect to Physical Damage Coverage, Trailer Interchange Coverage, Garagekeepers Coverage, Garagekeepers Coverage – Customers' Sound Receiving Equipment or the Single Interest Automobile Physical Damage Insurance Policy, the following exclusion is added:

**EXCLUSION OF TERRORISM**

We will not pay for "any injury, damage, loss or expense" caused directly or indirectly by "terrorism", including action in hindering or defending against an actual or expected incident of "terrorism". "Any injury, damage, loss or expense" is excluded, regardless of any other cause or event that contributes concurrently or in any sequence to such injury, damage, loss or expense. **But this exclusion applies only when one or more of the following are attributed to an incident of "terrorism":**

**1.** The "terrorism" is carried out by means of the dispersal or application of radioactive material, or through the use of a nuclear weapon or device that involves or produces a nuclear reaction, nuclear radiation or radioactive contamination; or

© ISO Properties, Inc., 2004

**2.** Radioactive material is released, and it appears that one purpose of the "terrorism" was to release such material; or

**3.** The "terrorism" is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

**4.** Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the "terrorism" was to release such materials; or

**5.** The total of insured damage to all types of property exceeds $25,000,000. In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the "terrorism" and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions; or

**6.** Fifty or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:

   **a.** Physical injury that involves a substantial risk of death; or

   **b.** Protracted and obvious physical disfigurement; or

   **c.** Protracted loss of or impairment of the function of a bodily member or organ.

Multiple incidents of "terrorism" which occur within a 72-hour period and appear to be carried out in concert or to have a related purpose or common leadership will be deemed to be one incident, for the purpose of determining whether the thresholds in Paragraphs **B.5.** and **B.6.** are exceeded.

With respect to this Exclusion, Paragraphs **B.5.** and **B.6.** describe the thresholds used to measure the magnitude of an incident of "terrorism" and the circumstances in which the threshold will apply, for the purpose of determining whether this Exclusion will apply to that incident. When the Exclusion applies to an incident of "terrorism", there is no coverage under this Coverage Form, Policy or any applicable endorsement.

However, with respect to Liability and Personal Injury Protection Coverage, if applicable, this Exclusion applies only to the extent that the limit of such coverage exceeds the state compulsory or financial responsibility law minimum limits for each coverage.

With respect to Uninsured and/or Underinsured Motorists Coverage, if applicable, this Exclusion applies only to the extent that the limit of such coverage exceeds the minimum statutory permitted limits for Uninsured and/or Underinsured Motorists Coverage. Those limits are equal to the minimum limit permitted for Liability Coverage.

**C.** With respect to Physical Damage Coverage, Trailer Interchange Coverage, Garagekeepers Coverage, Garagekeepers Coverage – Customers' Sound Receiving Equipment or the Single Interest Automobile Physical Damage Insurance Policy, the following exclusion is added:

**EXCLUSION OF TERRORISM**

We will not pay for any "loss", loss of use or rental reimbursement after "loss" caused directly or indirectly by "terrorism", including action in hindering or defending against an actual or expected incident of "terrorism". **But this exclusion applies only when one or more of the following are attributed to an incident of "terrorism":**

**1.** The "terrorism" is carried out by means of the dispersal or application of radioactive material, or through the use of a nuclear weapon or device that involves or produces a nuclear reaction, nuclear radiation or radioactive contamination; or

**2.** Radioactive material is released, and it appears that one purpose of the "terrorism" was to release such material; or

**3.** The "terrorism" is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

**4.** Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the "terrorism" was to release such materials; or

**5.** The total of insured damage to all types of property exceeds $25,000,000. In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the "terrorism" and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions.

 © ISO Properties, Inc., 2004 CA 23 86 01 06   □

Multiple incidents of "terrorism" which occur within a 72-hour period and appear to be carried out in concert or to have a related purpose or common leadership will be deemed to be one incident, for the purpose of determining whether the threshold in Paragraph **C.5.** is exceeded.

With respect to this Exclusion, Paragraph **C.5.** describes the threshold used to measure the magnitude of an incident of "terrorism" and the circumstances in which the threshold will apply, for the purpose of determining whether this Exclusion will apply to that incident. When the Exclusion applies to an incident of "terrorism", there is no coverage under this Coverage Form, Policy or any applicable endorsement.

**D.** In the event of any incident of "terrorism" that is not subject to the Exclusion in Paragraphs **B.** or **C.,** coverage does not apply to "any injury, damage, loss or expense" that is otherwise excluded under this Coverage Form, Policy or any applicable endorsement.

COMMERCIAL AUTO
CA 23 94 03 06

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# SILICA OR SILICA-RELATED DUST EXCLUSION FOR COVERED AUTOS EXPOSURE

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
GARAGE COVERAGE FORM
MOTOR CARRIER COVERAGE FORM
TRUCKERS COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

**A.** The following exclusion is added to Paragraph **B. Exclusions** of **Section II – Liability Coverage** in the Business Auto, Motor Carrier and Truckers Coverage Forms and for **"Garage Operations" – Covered "Autos"** in the Garage Coverage Form:

**SILICA OR SILICA-RELATED DUST EXCLUSION FOR COVERED AUTOS EXPOSURE**

This insurance does not apply to:

**1.** "Bodily injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, or ingestion of, "silica" or "silica-related dust".

**2.** "Property damage" arising, in whole or in part, out of the actual, alleged, threatened or suspected contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

**3.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any "insured" or by any other person or entity.

**B. Additional Definitions**

As used in this endorsement:

**1.** "Silica" means silicon dioxide (occurring in crystalline, amorphous and impure forms), silica particles, silica dust or silica compounds.

**2.** "Silica-related dust" means a mixture or combination of silica and other dust or particles.

© ISO Properties, Inc., 2005

# EXHIBIT "2"

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## DELTA DIVISION

ARMIS ADVISERS, LLC, as Special Administrator )
and Personal Representative of the Estate of )
PEGGY LYNN EVANS, deceased, and )
JACKIE LYNN EVANS, deceased, )
                         )
               PLAINTIFF, )
                         )
V. )      CASE NO. 2:19-cv-143-JM
                         )
BUNYOD KUSHNAZAROV, )      **JURY TRIAL DEMANDED**
                         )
PAPER IMPEX USA, INC., )
                         )
RAPTOR AUTO SHIPPING INC., and )
                         )
RPM FREIGHT SYSTEMS, LLC, )
                         )
             DEFENDANTS. )

## SECOND AMENDED COMPLAINT

COMES NOW, the Plaintiff, ARMIS ADVISERS, LLC, as Special Administrator and

Personal Representative of the Estate of PEGGY LYNN EVANS, deceased, and JACKIE LYNN

EVANS, deceased, by and through their undersigned counsel, Bailey & Oliver Law Firm and

Easley and Houseal, PLLC, and for their Second Amended Complaint, state as follows, to-wit:

INTRODUCTION

1.       This is an action under the Arkansas survival statute to recover damages due to the

Estates of JACKIE LYNN EVANS and PEGGY LYNN EVANS and the wrongful-death statute

to recover damages due to JACKIE LYNN EVANS's and PEGGY LYNN EVANS's wrongful-

death beneficiaries pursuant to Ark. Code Ann. §§ 16-62-101 and 102, and for ordinary negligence,

negligent hiring, negligent training, negligent supervision, negligent retention, and recklessness

that warrant punitive damages stemming from a rear-end vehicle collision that occurred on March 22, 2019.

PARTIES

2.      Plaintiff ARMIS ADVISERS, LLC is the duly appointed Special Administrator and Personal Representative of the Estate of JACKIE LYNN EVANS, deceased, and PEGGY LYNN EVANS, deceased.    The Order Appointing ARMIS ADVISERS, LLC and Letters of Administration are attached to this Complaint as Exhibit 1 and Exhibit 2. ARMIS ADVISERS, LLC brings this action on behalf of the Estate of JACKIE LYNN EVANS and PEGGY LYNN EVANS and their wrongful death beneficiaries pursuant to Arkansas Code Annotated §§ 16-62-101 and 16-61-102.

3.      Defendant BUNYOD KUSHNAZAROV, who was 22-years-old at the time of this incident giving rise to this action, is a resident of Kings County, New York.  Upon information and belief, Mr. KUSHNAZAROV can be served at 29 Murdock Court, Apartment 1A, Brooklyn, New York 11223.

4.      Defendant RAPTOR AUTO SHIPPING INC. ("RAPTOR AUTO SHIPPING") is a Pennsylvania for-profit corporation with its principal place of business at 12076 Abby Road, Apartment 2, Philadelphia, Pennsylvania 19154.   Upon information and belief, Defendant RAPTOR AUTO SHIPPING can be served through its registered agent for service of process, Dilnoza Isroilova, 12076 Abby Road, Apartment 2, Philadelphia, Pennsylvania 19154.

5.      Defendant PAPER IMPEX USA, INC. ("PAPER IMPEX") is a New York for-profit corporation with its principal place of business at 837 Father Capodanno Boulevard, Staten Island, New York 10305.  Defendant PAPER IMPEX can be served through its registered agent for service of process, Zafar Israilov, 587 Midland Avenue, Staten Island, New York, 10312.

2

6.     Defendant RPM FREIGHT SYSTEMS, LLC ("RPM") is a Michigan Domestic Limited Liability Company with its principal place of business at 301 West Fourth Street, Suite 200, Royal Oak, Michigan 48067. Defendant RPM FREIGHT SYSTEMS, LLC can be served through its registered agent for service of process, Barry Spilman, 301 West Fourth Street, Suite 200, Royal Oak, Michigan 48067.

7.     BUNYOD KUSHNAZAROV is, and was at all times relevant to this case, employed as a driver of a commercial motor vehicle by RAPTOR AUTO SHIPPING and PAPER IMPEX and was directed by RAPTOR AUTO SHIPPING, PAPER IMPEX, and RPM to transport various loads in interstate commerce subject to separate contract carrier agreements, broker agreements, and lease agreements between RAPTOR AUTO SHIPPING, PAPER IMPEX, and RPM.

8.     As a result of the relationship between BUNYOD KUSHNAZAROV and RAPTOR AUTO SHIPPING, PAPER IMPEX, and RPM, all alleged acts, omissions, negligence, and recklessness of BUNYOD KUSHNAZAROV set forth in this Complaint are imputed to RAPTOR AUTO SHIPPING, PAPER IMPEX, and RPM under the doctrine of *respondeat superior*.

<u>JURISDICTION AND VENUE</u>

9.     This Court has subject matter jurisdiction over this claim pursuant to 28 U.S.C. § 1332(a) as complete diversity exists between the parties and the amount in controversy exceeds $75,000.

10.    Defendants BUNYOD KUSHNAZAROV, PAPER IMPEX, RAPTOR AUTO SHIPPING, and RPM all have substantial and continuous contacts with the State of Arkansas including transacting business and using Arkansas roadways to haul, transport, and deliver freight.

3

Defendants BUNYOD KUSHNAZAROV, PAPER IMPEX, RAPTOR AUTO SHIPPING, and RPM also each made contact with Arkansas specifically for the incident that gives rise to this case. Defendants BUNYOD KUSHNAZAROV, PAPER IMPEX, RAPTOR AUTO SHIPPING, and RPM are all therefore subject to general and specific personal jurisdiction in the State of Arkansas.

11.     Venue in the Eastern Division of the Eastern District of Arkansas is proper under 28 U.S.C. § 1391 as a substantial part of the events or omissions giving rise to the claim occurred in St. Francis County, Arkansas.

<u>FACTS</u>

12.     PAPER IMPEX hauls automobiles and other freight across the roadways of the United States.  PAPER IMPEX has a fleet of 35 trucks and 28 drivers.  In 2018, PAPER IMPEX reported its fleet drove 3,790,000 miles across the United States, including the state of Arkansas.

13.     To aid in its large hauling operation, PAPER IMPEX employed RAPTOR AUTO SHIPPING to haul automobiles across the roadways of the United States.

14.     On March 22, 2019, BUNYOD KUSHNAZAROV was driving a tractor-trailer loaded with high-end vehicles under PAPER IMPEX's USDOT No. 2816195.

15.     Upon information and belief, the truck being driven by BUNYOD KUSHNAZAROV on March 22, 2019 was owned by PAPER IMPEX and leased by PAPER IMPEX to RAPTOR AUTO SHIPPING.

16.     On March 22, 2019, JACKIE LYNN EVANS and PEGGY LYNN EVANS were traveling eastbound on Interstate 40 in St. Francis County, Arkansas.

17.     Traffic was slow and congested due to a wreck that occurred across the median in the westbound lanes.  Traffic began to slow and come to a stop.  JACKIE LYNN EVANS and PEGGY LYNN EVANS entered the right lane of traffic and slowed down with the traffic.  Not

4

long after, the loaded tractor-trailer driven by BUNYOD KUSHNAZAROV crashed into the back of the EVANS's Honda Accord with enough force to crush the 2017 Honda Accord of JACKIE LYNN EVANS and PEGGY LYNN EVANS like a tin can.

18.     Both JACKIE LYNN EVANS and PEGGY LYNN EVANS were killed by the collision.

19.     The PAPER IMPEX/RAPTOR AUTO SHIPPING tractor-trailer left over 100 feet of skid marks on the road.

20.     The loaded PAPER IMPEX/RAPTOR AUTO SHIPPING tractor-trailer was traveling at such a high rate of speed that it crushed the EVANS's Accord into another tractor-trailer in front of the EVANS.  The collision was so forceful that the EVANS's car, propelled by the collision, pushed the tractor-trailer in front of it into a truck *in front of that tractor-trailer*.  That Ford pickup was then forced into a Chevrolet pickup truck *in front of the Ford*.

21.     The responding officer found the EVANS's Honda Accord underneath the front of the PAPER IMPEX/RAPTOR AUTO SHIPPING tractor-trailer.  Both the EVANS's Honda Accord and the PAPER IMPEX/RAPTOR AUTO SHIPPING tractor-trailer were forced off the roadway by the impact.   The PAPER IMPEX/RAPTOR AUTO SHIPPING tractor-trailer jackknifed, and both the EVANS's Honda Accord and the PAPER IMPEX/RAPTOR AUTO SHIPPING truck, which started out facing east, were spun violently and ended up facing southwest in the grass off the Interstate.

22.     The Federal Motor Carrier Safety Administration ("FMCSA") uses a Safety Measurement System ("SMS") to measure and gauge the safety of trucking carriers in the United States and reports data collected within the previous two years.

23.     According to the FMCSA's SMS, in the two years before the filing of this complaint, motor carrier enforcement officers inspecting PAPER IMPEX drivers and tractor-trailers found

a)   <u>At least 26 unsafe driving violations</u> by PAPER IMPEX.  These violations include following too close and speeding.

b)   <u>At least 26 hours-of-service compliance violations</u> by PAPER IMPEX.  These violations include without limitation of PAPER IMPEX's drivers filing false reports of their record-of-duty status and for driving more hours than allowed under the applicable driving hours limit.

c)   <u>At least 29 vehicle maintenance violations</u> by PAPER IMPEX.  These violations include failure to secure the vehicle and brake system pressure loss.

d)   <u>At least 5 driver fitness violations</u> by PAPER IMPEX.  These violations include without limitation driving a commercial motor vehicle with a suspended driver's license for a safety-related reason and because the driver could not read or speak the English language sufficiently to respond to official inquiries.

24.     At least 6 crashes in five states.

25.     PAPER IMPEX has an F rating from the Better Business Bureau.

26.     According to the FMCSA's SMS, RAPTOR AUTO SHIPPING is out of service and is currently prohibited from operating commercial motor vehicles in interstate commerce.  Its ability to operate commercial motor vehicles in interstate commerce was revoked due to a refusal to allow an audit.

27. Based on information and belief, Defendant RPM entered into a contract with Defendant PAPER IMPEX, and/or with RAPTOR AUTO SHIPPING, to provide transportation and trucking services for a haul of Tesla vehicles.

28. On or about March 22, 2019, BUNYOD KUSHNAZAROV was directed by RPM, by PAPER IMPEX, and by RAPTOR AUTO SHIPPING, to transport and deliver this haul of Tesla vehicles.

29. RPM controlled, managed, and supervised the manner, method, and procedure for how this load would be transported, including the date and time the load was to be picked up and delivered, the route to be taken, payment restrictions, and extensive driving instructions.

30. Further, RPM, PAPER IMPEX, and RAPTOR AUTO SHIPPING were engaged in a joint venture with an equal right to control the venture and an agreement among them to participate in a common enterprise for the purpose of commercially transporting freight in interstate commerce, and were acting within the course and scope of this venture in furthering the business and duties of each other and are liable for the negligence of each other.

31. At the time of the crash on March 22, 2019 and at all times relevant to this Complaint, BUNYOD KUSHNAZAROV was acting within the scope of his agency and employment, and under the control of, RAPTOR AUTO SHIPPING, PAPER IMPEX, and RPM and furthering the joint venture between them.

32. As a result of the relationship between RPM, PAPER IMPEX, RAPTOR AUTO SHIPPING, and BUNYOD KUSHNAZAROV, all alleged acts, omissions, negligence, and recklessness of BUNYOD KUSHNAZAROV set forth in this Complaint are imputed to RAPTOR AUTO SHIPPING, PAPER IMPEX, and to RPM under the doctrine of *respondeat superior*.

33.     Irrespective of the employment relationship, RPM is a broker of interstate motor carriers subject to FMCSA Regulations and is therefore responsible for the acts and omissions of PAPER IMPEX, RAPTOR AUTO SHIPPING, and BUNYOD KUSHNAZAROV.

34.     In the alternative, RPM acted as a broker of the load being hauled by the tractor-trailer being driven by BUNYOD KUSHNAZAROV and in that capacity selected, hired, and contracted with PAPER IMPEX, RAPTOR AUTO SHIPPING, and BUNYOD KUSHNAZAROV to haul the load.

35.     The Arkansas Supreme Court has recognized that an employer may be held liable for the conduct of a careless, reckless, or incompetent independent contractor when the employer was negligent in hiring the contractor.  The employer may also be liable in the case of hiring an independent contractor when the employer has undertaken to perform certain duties or activities and negligently fails them thereafter or performs them in a negligent manner. *Stoltze v. Arkansas Valley Elec. Co-op. Corp.*, 354 Ark. 601, 607, 127 S.W.2d 466, 470 (2003).

36.     Courts around the country have applied this legal standard specifically to brokers hiring trucking carriers to transport freight.  For example, a federal court in Maryland held:

> I believe that [the defendant broker's] self-proclaimed status as a "third party logistics company" providing "one point of contact" service to its shipper clients is sufficient under Maryland law to require it to use reasonable care in selecting the truckers whom it maintains in its stable of carriers.

> This duty to use reasonable care in the selection of carriers includes, at least, the subsidiary duties (1) to check the safety statistics and evaluations of the carriers with whom it contracts available on the SafeStat database maintained by FMSCA, and (2) to maintain internal records of the persons with whom it contracts to assure that they are not manipulating their business practices in order to avoid unsatisfactory SafeStat ratings.  These obligations are not onerous, and I do not find that imposition of such a common law duty would be incompatible with the regulations promulgated by the FMCSR.  To the contrary, imposing a common law duty upon third party logistics companies to use reasonable care in selecting carriers

furthers the critical federal interest in protecting drivers and passengers on the nation's highways.

*Schramm v. Foster*, 341 F. Supp. 2d 536, 551-52 (D. Md. 2003) (internal citations omitted).

37.    RPM had a duty to reasonably investigate, monitor, retain, and train PAPER IMPEX, RAPTOR AUTO SHIPPING, and BUNYOD KUSHNAZAROV with respect to safety issues.

38.    Further, PAPER IMPEX had a duty to reasonably investigate, monitor, retain, and train RAPTOR AUTO SHIPPING and BUNYOD KUSHNAZAROV with respect to safety issues.

39.    Finally, RAPTOR AUTO SHIPPING had a duty to reasonably investigate, monitor, retain, and train BUNYOD KUSHNAZAROV with respect to safety issues.

40.    As the direct, foreseeable, legal, and proximate result of the negligence of RPM, PAPER IMPEX, RAPTOR AUTO SHIPPING, and BUNYOD KUSHNAZAROV, Plaintiff suffered serious damages, including the death of their loved ones.

## COUNT I: WRONGFUL DEATH AND SURVIVAL ACTION

41.    Plaintiff incorporates each and every foregoing paragraph by reference as if set forth herein word for word.

42.    Companies, and their agents, servants, employees, and contractors must never needlessly endanger anyone.

43.    Companies, and their agents, servants, employees, and contractors must be safe at all they do to prevent harm.

44.    Companies, and their agents, servants, employees, and contractors must comply with all regulatory and legal requirements to prevent harm.

45.    Companies, and their agents, servants, employees, and contractors must exercise ordinary and reasonable care for the protection and safety of all motorists on the highway.

9

46.     Companies, and their agents, servants, employees, and contractors must never put profits over safety.

47.     RPM, PAPER IMPEX, RAPTOR AUTO SHIPPING, and BUNYOD KUSHNAZAROV breached the duties they owed to JACKIE LYNN EVANS and PEGGY LYNN EVANS when they failed to uphold the standard of care utilized by drivers and corporations in good-standing who are engaged in the same type of service or specialty.

48.     Such negligence, including without limitation the acts and omissions denoted in detail in each paragraph of this Complaint, were the proximate causes of the deaths of JACKIE LYNN EVANS and PEGGY LYNN EVANS.

49.     Pursuant to A.C.A § 16-62-101 and § 16-62-102, ARMIS ADVISERS, LLC, as Special Administrator and Personal Representative of the Estate of PEGGY LYNN EVANS, deceased, and JACKIE LYNN EVANS, deceased, claim damages on behalf of the estates and all wrongful death beneficiaries of JACKIE LYNN EVANS and PEGGY LYNN EVANS.

COUNT II: ORDINARY NEGLIGENCE<br>
<strong>DEFENDANTS RPM, PAPER IMPEX, RAPTOR AUTO SHIPPING, AND BUNYOD KUSHNAZAROV</strong>

50.     Plaintiff incorporates each and every foregoing paragraph by reference as if set forth herein word for word.

51.     At the time of the wreck that killed JACKIE LYNN EVANS AND PEGGY LYNN EVANS, the ordinary negligence of RPM, PAPER IMPEX, RAPTOR AUTO SHIPPING, and BUNYOD KUSHNAZAROV included without limitation:

        a) BUNYOD KUSHNAZAROV, and RPM, PAPER IMPEX, and RAPTOR AUTO SHIPPING by and through the theory of *Respondeat Superior*, engaged in careless and prohibited driving in violation of Ark. Code Ann. § 27-51-104;

10

b) BUNYOD KUSHNAZAROV, and RPM, PAPER IMPEX, and RAPTOR AUTO SHIPPING by and through the theory of *Respondeat Superior*, failed to control the speed of the vehicle as was necessary to avoid a collision, in violation of Ark. Code Ann. § 27-51-201;

c) BUNYOD KUSHNAZAROV, and RPM, PAPER IMPEX, and RAPTOR AUTO SHIPPING by and through the theory of *Respondeat Superior*, failed to keep a proper lookout in violation of Ark. Code Ann. § 27-51-104(a);

d) BUNYOD KUSHNAZAROV, and RPM, PAPER IMPEX, and RAPTOR AUTO SHIPPING by and through the theory of *Respondeat Superior*, failed to keep the vehicle under proper control in violation of Ark. Code Ann. § 27-51-104(b)(6); and

e) BUNYOD KUSHNAZAROV, and RPM, PAPER IMPEX, and RAPTOR AUTO SHIPPING by and through the theory of *Respondeat Superior*, failed to use the highest degree of care.

52.   RPM, PAPER IMPEX, and RAPTOR AUTO SHIPPING failed to have in place and/or failed to follow adequate and proper policies and procedures for safety of the commuting public.

53.   RPM, PAPER IMPEX, and RAPTOR AUTO SHIPPING failed to have in place and/or failed to follow adequate and proper policies in accordance with accepted industry standards ordinarily used by companies in the same or similar business.

54.   This ordinary negligence was a proximate cause of the injuries and death of JACKIE LYNN EVANS and PEGGY LYNN EVANS; and the damages set forth below.

11

<u>COUNT III: NEGLIGENT HIRING</u>
**DEFENDANTS RPM, PAPER IMPEX, AND RAPTOR AUTO SHIPPING**

55.     Plaintiff incorporates each and every foregoing paragraph by reference as if set forth herein word for word.

56.     PAPER IMPEX had a duty to have adequate policies and procedures in place to ensure the persons it allowed to drive under its USDOT number, control, and supervision were competent, safe, adequately trained, and qualified.

57.     RAPTOR AUTO SHIPPING had a duty to have adequate policies and procedures in place to ensure the persons it hired to operate a commercial motor vehicle were competent, safe, adequately trained, and qualified.

58.     RPM had a duty to ensure that the companies and persons it retained to haul freight were competent, safe, adequately trained, and qualified.

59.     PAPER IMPEX, RAPTOR AUTO SHIPPING, and RPM failed in their duties and were negligent when they chose not to have in place or chose not to follow proper policies and procedures, resulting in the retention of a company or companies and hiring of a driver who was neither qualified nor competent to exercise sound judgment and safely operate a commercial tractor-trailer.

60.     RPM's negligence in hiring an unqualified and incompetent carrier or carriers, PAPER IMPEX's negligence in hiring an unqualified and incompetent driver and leasing its tractor-trailer to an unqualified and incompetent carrier, and RAPTOR AUTO SHIPPING's negligence in hiring an unqualified and incompetent driver were proximate causes of the injuries and deaths of JACKIE LYNN EVANS and PEGGY LYNN EVANS, and the damages set forth below.

## COUNT IV: NEGLIGENT TRAINING
### DEFENDANTS RPM, PAPER IMPEX, AND RAPTOR AUTO SHIPPING

61.   Plaintiff incorporates each and every foregoing paragraph by reference as if set forth herein word for word.

62.   RPM, PAPER IMPEX, and RAPTOR AUTO SHIPPING had a duty to have adequate policies and procedures in place to ensure they properly and sufficiently trained their drivers on safe driving practices and techniques.

63.   RPM, PAPER IMPEX, and RAPTOR AUTO SHIPPING did not train BUNYOD KUSHNAZAROV on using safe driving practices and techniques before placing him in an employment position as one of their drivers.

64.   RPM, PAPER IMPEX, and RAPTOR AUTO SHIPPING failed in their duties and were negligent when they chose not to have in place or chose not to follow proper policies and procedures, resulting in the inadequate training of drivers who were not qualified and competent to exercise sound judgment and safely drive a commercial tractor-trailer.

65.   RPM's, PAPER IMPEX's, and RAPTOR AUTO SHIPPING's negligence in failing to properly train BUNYOD KUSHNAZAROV was a proximate cause of the injuries and deaths of JACKIE LYNN EVANS and PEGGY LYNN EVANS and the damages set forth below.

## COUNT V: NEGLIGENT SUPERVISION
### DEFENDANTS RPM, PAPER IMPEX, AND RAPTOR AUTO SHIPPING

66.   Plaintiff incorporates each and every foregoing paragraph by reference as if set forth herein word for word.

67.   RPM, PAPER IMPEX, and RAPTOR AUTO SHIPPING had a duty to have adequate policies and procedures in place to ensure they properly and sufficiently supervised their drivers.

68.     RPM, PAPER IMPEX, and RAPTOR AUTO SHIPPING did not supervise BUNYOD KUSHNAZAROV to ensure he was using sound judgement and practicing safe driving techniques and habits while driving under PAPER IMPEX's USDOT number and as a driver for PAPER IMPEX and RAPTOR AUTO SHIPPING.

69.     RPM, PAPER IMPEX, and RAPTOR AUTO SHIPPING failed in their duty and were negligent when they chose not to have in place or chose not to follow proper policies and procedures, resulting in the inadequate training of BUNYOD KUSHNAZAROV.

70.     The failure of RPM, PAPER IMPEX, and RAPTOR AUTO SHIPPING to consider and act upon the safety concerns and to properly train BUNYOD KUSHNAZAROV is negligence.

71.     RPM, PAPER IMPEX, and RAPTOR AUTO SHIPPING's negligence includes, but is not limited to, failing to train BUNYOD KUSHNAZAROV about the duties imposed by the Federal Motor Carrier Safety Act (FMCSA), especially those regulations regarding speed, following too closely, keeping vehicles under control, and driving safely for the conditions.

72.     RPM's, PAPER IMPEX's, and RAPTOR AUTO SHIPPING's negligence in failing to properly train BUNYOD KUSHNAZAROV was a proximate cause of the injuries and deaths of JACKIE LYNN EVANS and PEGGY LYNN EVANS and the damages set forth below.

<u>COUNT VI: NEGLIGENT RETENTION</u>
**DEFENDANTS RPM, PAPER IMPEX AND RAPTOR AUTO SHIPPING**

73.     Plaintiff incorporates each and every foregoing paragraph by reference as if set forth herein word for word.

74.     RPM, PAPER IMPEX, and RAPTOR AUTO SHIPPING had a duty to have adequate policies and procedures in place to ensure they properly and sufficiently retained qualified and competent drivers.

14

75.     RPM, PAPER IMPEX, and RAPTOR AUTO SHIPPING failed in their duty and were negligent when they chose not to have in place or chose not to follow proper policies and procedures resulting in the retention of unqualified and incompetent drivers.

76.     RPM's, PAPER IMPEX's, and RAPTOR AUTO SHIPPING's negligence in retaining BUNYOD KUSHNAZAROV was a proximate cause of the injuries and deaths of JACKIE LYNN EVANS and PEGGY LYNN EVANS and the damages set forth below.

## DAMAGES

77.     Plaintiff incorporates each and every foregoing paragraph by reference as if set forth herein word for word.

78.     In addition to the physical injuries and horrific mental anguish JACKIE LYNN EVANS and PEGGY LYNN EVANS suffered prior to their untimely deaths, they also suffered the loss of enjoying their lives, their family, and their friends.

79.     All of this was taken from JACKIE LYNN EVANS and PEGGY LYNN EVANS, and their family and friends, when the RPM, PAPER IMPEX, and RAPTOR AUTO SHPPING truck driven by BUNYOD KUSHNAZAROV slammed into the rear of their car.

80.     Plaintiff, ARMIS ADIVSERS, as Special Administrator and Personal Representative of the Estate of PEGGY LYNN EVANS, deceased, and JACKIE LYNN EVANS, deceased, are entitled to recover the following elements of damage on behalf of the estates and wrongful death beneficiaries of JACKIE LYNN EVANS and PEGGY LYNN EVANS:

a) JACKIE LYNN EVANS's and PEGGY LYNN EVANS's loss of life;

b) JACKIE LYNN EVANS's and PEGGY LYNN EVANS's loss of enjoyment of life;

c)  The nature, extent, duration, and permanency of JACKIE LYNN EVANS's and PEGGY LYNN EVANS's injuries;

d)  The conscious pain, suffering, and mental anguish experienced by JACKIE LYNN EVANS and PEGGY LYNN EVANS prior to their deaths;

e)  The value of any earnings lost;

f)  The present value of any earnings reasonably certain to be lost in the future;

g)  The present value of any loss of ability to earn in the future;

h)  All pecuniary injuries sustained by the wrongful death beneficiaries of JACKIE LYNN EVANS and PEGGY LYNN EVANS as a result of the Defendants' negligence;

i)  Mental anguish suffered in the past by the wrongful death beneficiaries of JACKIE LYNN EVANS and PEGGY LYNN EVANS as a result of the Defendants' negligence;

j)  Mental Anguish reasonably probable to be suffered in the future by the wrongful death beneficiaries of JACKIE LYNN EVANS and PEGGY LYNN EVANS as a result of the Defendants' negligence;

k)  All damages, including special damages, that may be afforded to the Plaintiff based on the facts, claims, and allegations set forth in this Complaint or subsequently discovered in litigation or trial of this matter; and

l)  All other damages afforded under the law or deemed applicable by the Arkansas Model Jury Instructions.

## PUNITIVE DAMAGES

81.     Plaintiff incorporates each and every foregoing paragraph by reference as if set forth herein word for word.

**The Recklessness of RPM**

82.     RPM hired PAPER IMPEX, RAPTOR AUTO SHIPPING, and BUNYOD KUSHNAZAROV to transport freight across the United States on the roadways with other motorists, despite the clear and convincing data, as set forth in paragraphs 27, 28, 29, and 30 above, that both PAPER IMPEX and RAPTOR AUTO SHIPPING where wholly unfit and probably would cause injury to the motoring public.

83.     RPM knew, or should have known, that PAPER IMPEX, RAPTOR AUTO SHIPPING, and BUNYOD KUSHNAZAROV posed danger to fellow travelers on the road.

84.     Because RPM knew, or should have known, that its conduct would naturally and probably result in injury, but continued such conduct in reckless disregard of the consequences, the Plaintiff prays for punitive damages against RPM in an amount sufficient to punish RPM for its knowingly reckless conduct to deter it and other wrongdoers from similar conduct in the future.

**The Recklessness of PAPER IMPEX**

85.     PAPER IMPEX hired RAPTOR AUTO SHIPPING and BUNYOD KUSHNAZAROV to transport freight across the United States on the roadways with other motorists, despite the clear and convincing indications, based on the information set forth in above in this Complaint, that RAPTOR AUTO SHIPPING and BUNYOD KUSHNAZAROV would naturally and probably cause injury to the motoring public.

86.     PAPER IMPEX knew, or should have known, that RAPTOR AUTO SHIPPING and BUNYOD KUSHNAZAROV posed danger to fellow travelers on the road.

87. Because PAPER IMPEX knew, or should have known, that its conduct would naturally and probably result in injury, but continued such conduct in reckless disregard of the consequences, the Plaintiff prays for punitive damages against PAPER IMPEX in an amount sufficient to punish PAPER IMPEX for its knowingly reckless conduct to deter it and other wrongdoers from similar conduct in the future.

**The Recklessness of RAPTOR AUTO SHIPPING**

88. RAPTOR AUTO SHIPPING hired BUNYOD KUSHNAZAROV to transport freight across the United States on the roadways with other motorists, in reckless disregard of the fact that BUNYOD KUSHNAZAROV was clearly unqualified to drive a commercial vehicle in the United States.

89. RAPTOR AUTO SHIPPING knew, or should have known, that the unqualified and reckless BUNYOD KUSHNAZAROV would naturally and probably harm cause to fellow travelers on the road.

90. Because RAPTOR AUTO SHIPPING knew, or should have known, that its conduct would naturally and probably result in injury, but continued such conduct in reckless disregard of the consequences, the Plaintiff prays for punitive damages against RAPTOR AUTO SHIPPING in an amount sufficient to punish RAPTOR AUTO SHIPPING for its knowingly reckless conduct to deter it and other wrongdoers from similar conduct in the future.

**The Recklessness of BUNYOD KUSHNAZAROV**

91. Upon information and belief, BUNYOD KUSHNAZAROV was engaging in reckless behavior prior to rear-ending JACKIE LYNN EVANS and PEGGY LYNN EVANS with enough force on a clear day to render their Honda Accord unrecognizable and to cause a five-car

pileup, including causing JACKIE LYNN EVANS's and PEGGY LYNN EVANS's Honda Accord to push another tractor-trailer into two other pickup trucks.

92.     Upon information and belief, BUNYOD KUSHNAZAROV was impaired and/or distracted prior to crashing into the vehicle of JACKIE LYNN EVANS and PEGGY LYNN EVANS.

93.     Therefore, the Plaintiff prays for punitive damages against BUNYOD KUSHNAZAROV, and RPM, PAPER IMPEX, and RAPTOR AUTO SHIPPING through the doctrine of *respondeat superior*, in an amount sufficient to punish him for his reckless conduct and to deter him and other wrongdoers from similar conduct in the future.

<u>JURY TRIAL DEMANDED</u>

94.     Plaintiff demands a trial by jury.

95.     Plaintiff seeks damages in an amount in excess of the amount necessary for federal jurisdiction in diversity cases.

96.     Plaintiff seeks a jury to act as the conscience of the community; not only to compensate the Plaintiff for the injuries of JACKIE LYNN EVANS and PEGGY LYNN EVANS, but also to deter similar conduct in the community in the future.[1]

97.     "The jury is the mechanism provided by common law for determination of questions involving the presence or absence of due care, reasonableness, prudence, decency, and other concepts reflecting the common sense and/or conscience of a community." *Gent v. State*, 393 S.W.2d 219, 223, 239 Ark. 474, 481 (1965).  In this case, Plaintiff requests that a jury, as the conscience of the community, determine whether Defendants' behavior that ended the lives of

---

[1] *Williams v. O'Neal Ford, Inc.*, 282 Ark. 362, 365, 668 S.W.2d 545, 546 (Ark. 1984) (stating that the jury in that case had acted as the "conscience of the community" in punishing the wrongdoer); *see also Georgia-Pacific Corp. v. Carter*, 371 Ark. 295, 303, 265 S.W.3d 107, 112 (2007) (identifying "compensation and **deterrence**" as "the tort system's primary objectives" (emphasis added)).

19

JACKIE LYNN EVANS and PEGGY LYNN EVANS met the standards of reasonableness, due

care, prudence, and decency.[2]

98.     The Plaintiff asks for a jury to set the standards, not only for this case, but for the

next cases that are tried.  As Dean Prosser noted over 50 years ago:

> The "prophylactic" factor of preventing future harm has been quite
> important in the field of torts. **The courts are concerned not only with
> compensation of the victim, but with admonition of the wrongdoer.**
> When the decision of the courts become known, and defendants realize that
> they may be held liable, there is of course a strong incentive to prevent the
> occurrence of the harm.[3]

99.     The Plaintiff in this case is not solely concerned with the compensation for their

own harms and losses, but they also seek a jury to set standards in the community that provide the

incentive for the Defendants and those similarly situated to prevent the occurrence of the same

harm to other members of the community in the future.[4]

100.    Plaintiff reserves the right, as discovery develops, to amend this Complaint,

including without limitation additional counts and facts supportive of compensatory or punitive

damages, or both, against the current defendants or against additional defendants to be joined.

WHEREFORE, premises considered, Plaintiff prays for judgment against Defendants,

jointly and severally, in an amount in excess of the amount necessary for federal jurisdiction in

---

[2] *Harris v. Steelweld Equip. Co., Inc.*, 869 F.2d 396, 406, n.13 (8th Cir. 1989) (stating in a footnote that it was not fundamental error for defense counsel to argue in closing, "you set the standards for our community. You six people will set the standards in this case and the next case that's tried.").

[3] *Nice v. ZHRI, Inc.*, 105 F. Supp. 2d 1028, 1030 (E.D. Ark. 2000) (citing *Prosser, Handbook on the Law of Torts*, p. 23 (3d ed. 1964); *Prosser and Keeton, Torts*, § 4, at 25 (5th ed. 1984)) (emphasis added).

[4] *Razorback Cab of Fort Smith, Inc. v. Amon*, 2016 Ark. App. 352, *3, 498 S.W.3d 346, 350 (2016). The circuit "court had granted a motion in limine prohibiting send-a-message statements" but allowed plaintiff's counsel to argue, "They are going to keep running until someone catches them and says, it stops here, and that is what I am asking you to do, to step up and let them know that safety matters in Arkansas." *Id.* The court of appeals ruled that the circuit court did not abuse its discretion in refusing to instruct the jury to disregard the remark, stating that the "remark by [plaintiff's] counsel merely echoed his overriding theme that [defendant] was 'running' from its responsibilities by blaming [plaintiff] for the accident" and that plaintiff's counsel's "closing arguments, when viewed in their entirety, can reasonably be viewed as a plea to hold [defendant] liable for the accident, rather than a plea to punish [defendant]." *Id.* at *3-4, 498 S.W.3d at 350.

diversity of citizenship cases, the exact amount to be determined by a jury, for punitive damages, for attorneys' fees and costs of this litigation, and for all other relief to which they may be entitled.

Dated this ___ day of July, 2020.

Respectfully Submitted,

Sach D. Oliver, AR Bar No. 2006521
Frank H. Bailey, AR Bar No. 74004
T. Ryan Scott, AR Bar No. 2008161
Geoff D. Hamby, AR Bar No. 2015171
BAILEY & OLIVER LAW FIRM
3606 Southern Hills Boulevard
Rogers, AR 72758
(479) 202-5200 Phone
(479) 202-5605 Fax
soliver@baileyoliverlawfirm.com
fbailey@baileyoliverlawfirm.com
rscott@baileyoliverlawfirm.com
ghamby@baileyoliverlawfirm.com

and

John I. Houseal, AR Bar No. 03207
Easley & Houseal, PLLC
Post Office Box 1115
Forrest City, AR 72336-1115
(870) 633-1447 Phone
(870) 633-1688 Fax
john@ehtriallawyer.com

*Attorneys for the Plaintiffs*